# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

ORLANDO CRESPIN-VALLADARES;
SANDRA YANIRA MELGAR-MELGAR;
S.E.C.M.; S.O.C.M.,

<em>Petitioners,</em>

v.

ERIC H. HOLDER, JR., Attorney
General,

<em>Respondent.</em>

No. 09-1423

On Petition for Review of an
Order of the Board of Immigration Appeals.

Argued: December 8, 2010

Decided: February 16, 2011

Before MOTZ, KING, and GREGORY, Circuit Judges.

Petition for review granted and case remanded for further pro-
ceedings by published opinion. Judge Motz wrote the opinion,
in which Judge King and Judge Gregory joined.

## COUNSEL

**ARGUED:** Jennifer Loraine Swize, JONES DAY, Washing-
ton, D.C., for Petitioners. Carol Federighi, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for

Respondent. **ON BRIEF:** Walter D. Kelley, Jr., Tara Lynn R. Zurawski, Jason B. Taub, JONES DAY, Washington, D.C.; Jonathan A. Muenkel, JONES DAY, New York, New York, for Petitioners. Tony West, Assistant Attorney General, Margaret Perry, Senior Litigation Counsel, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

Orlando Crespin-Valladares and his wife and children ("the Crespins"), citizens of El Salvador, petition for review of a final order of removal entered by the Board of Immigration Appeals (BIA). Crespin argues that he and his family deserve asylum because he fears persecution in El Salvador on account of his family ties. An immigration judge (IJ) accepted this argument and granted the Crespins' asylum application, but the BIA vacated and ordered their removal. For the reasons that follow, we grant the Crespins' petition for review and remand to the BIA.

I.

The Crespins seek asylum because of events arising from the murder of Crespin's cousin in El Salvador. We detail those events as Crespin described them in his testimony, an account that the IJ found credible and that the BIA did not dispute. We then outline the legal proceedings that followed.

A.

In January of 2004, in Crespin's hometown of Sonsonate, El Salvador, four members of the Mara Salvatrucha 13 gang ("MS-13") fatally shot Crespin's cousin. Crespin heard the

shots as he was walking towards his uncle's house, and he witnessed four MS-13 members fleeing the scene. After arriving at his uncle's house, Crespin described the four men to the police; his description matched the one provided by Crespin's uncle, who had witnessed the murder.

Two weeks later, another shooting occurred in Sonsonate, and the police connected it to the murder of Crespin's cousin. They summoned Crespin and his uncle to the police station, where Crespin saw two of his cousin's four attackers, whom the police had arrested, sitting on a bench inside. The two gang members watched Crespin and his uncle enter a detective's office, at which point Crespin informed the detective that he recognized both attackers. Crespin and his uncle then agreed to testify against the two men.

Shortly thereafter, MS-13 members began threatening Crespin and his uncle. As the murder trial approached, gang members "repeatedly" told Crespin's uncle that they would kill him if he continued cooperating with the police. On one occasion, a gang member held a gun to the uncle's head and pulled the trigger twice, although an apparent malfunction prevented it from firing. The prosecutor subsequently provided the uncle 24-hour police protection. While he was under this protection, MS-13 members threatened his wife. He nonetheless testified as the prosecution's primary eyewitness, and a court convicted both defendants. The other two assailants were not apprehended. The police withdrew the uncle's protection upon the trial's completion, and the same day he fled the country.

MS-13 similarly threatened Crespin on three occasions. Because he did not witness the murder, however, he received no police protection. The first threat came soon after his encounter with his cousin's attackers at the police station; gang members slipped a note under his door declaring that he would be "next" if he persisted in his cooperation with the police. Upon finding the note, Crespin and his family fled

Sonsonate for a relative's home in San Salvador. When Crespin returned to Sonsonate the next month to collect his mail, inside his house he found another note proclaiming that the gang would kill him if he "went to court." Finally, as Crespin drove through Sonsonate later that month, he encountered one of his cousin's killers, who shouted that "you need to shut up or we are going to kill you."

Afraid, Crespin planned his family's escape to the United States. To that end, he left his children with an uncle in San Salvador and, in May or June 2004, traveled with his wife to the United States on tourist visas. They returned to El Salvador after about two months to collect their children and make arrangements for the family's relocation to the United States. On December 26, 2004, United States border patrol agents apprehended the Crespins as they entered the United States.

## B.

At the removal hearing, the Crespins conceded their removability but applied for asylum. In particular, Crespin claimed that he harbored a well-founded fear of persecution because of his membership in a social group "consisting of family members of those who actively oppose gangs in El Salvador by agreeing to be prosecutorial witnesses." Crespin and his wife testified to the facts outlined above. In addition, they provided the written testimony of Luz Nagle, a law professor and former Colombian judge, who explained that MS-13 has murdered government witnesses in the past and that gang members often intimidate their enemies by attacking those enemies' families. Professor Nagle also explained that recent government efforts to control gang violence in El Salvador remain ineffective. Finally, Crespin submitted various news articles and governmental reports analyzing Salvadoran gang violence.

After considering this evidence, the IJ made several relevant findings. First, he found that the Crespins' proposed

social group of "family members of those who actively oppose gangs in El Salvador by agreeing to be prosecutorial witnesses" qualified as a "particular social group" under the Immigration and Nationality Act (INA). Second, the IJ determined that Crespin had demonstrated a sincere and objectively reasonable fear that he would suffer persecution were he to return to El Salvador. Third, the IJ concluded that the Salvadoran government's attempts to control gang violence had failed. Fourth, the IJ found that "[a]t least one central reason why the gang members targeted [Crespin] was because of his uncle's cooperation with the Salvadoran government" and that the persecution of Crespin was therefore on account of his membership in a particular social group.

Accordingly, on July 10, 2007, the IJ granted Crespin's asylum application, as well as the derivative applications of his wife and children. The Government appealed to the BIA.

## C.

Almost two years later, on March 12, 2009, the BIA vacated the IJ's grant of asylum and ordered the Crespins' removal. It identified two reasons for doing so.[1] First, the BIA stated that "'those who actively oppose gangs in El Salvador by agreeing to be prosecutorial witnesses' does not qualify as a particular social group." Second, it concluded that Crespin faced no well-founded fear of persecution, reasoning that Crespin suffered "mere threats and harassment" that failed to give rise to anything more than a "generalized fear of harm."

---

[1]The BIA also rejected Crespin's alternative arguments that he feared persecution on account of his political opinion, merited relief under the Convention Against Torture, and was entitled to withholding of removal. Of these arguments, the Crespins now pursue only their claim for withholding of removal. Because this argument appears only in one short paragraph in the Crespins' reply brief, we decline to address it. *See A Helping Hand, LLC v. Baltimore County*, 515 F.3d 356, 369 (4th Cir. 2008).

On April 9, 2009, the Crespins appealed to this Court. Four days later, they filed a motion to reconsider with the BIA. The BIA denied that motion on November 24, 2009, and in so doing, provided additional justifications for the denial of the Crespins' asylum application. Specifically, the BIA opined that Crespin had not demonstrated a nexus between his asserted persecution and his proposed social group. It also concluded that, because "the Salvadoran government has focused law enforcement efforts on suppressing gang violence," the Crespins had failed to demonstrate that the government was "unable or unwilling to protect them from MS-13." Accordingly, the BIA reaffirmed its prior decision and denied the Crespins' motion to stay removal. The Crespins did not petition for review of this order.

The Government then moved this Court to remand the Crespins' appeal of the original removal order to the BIA so that the BIA could clarify the interaction between that order and its order denying reconsideration.[2] We denied the Government's motion.

## II.

We first address the parties' preliminary arguments. The Government, echoing the assertions made in its motion to remand, urges us to remand or dismiss the Crespins' petition for lack of jurisdiction. In contrast, the Crespins contend that we have jurisdiction to review the BIA's removal order, but only on the grounds set out in the original order. We reject both arguments.

---

[2]The Government had previously filed a motion to remand to allow the BIA to remedy the failure of its initial decision to "address the precise social group that was the basis for the [IJ's] grant of asylum." The Government subsequently claimed, however, that the BIA's order denying the Crespins' motion for reconsideration rectified the error, which led the Government to file this revised motion.

A.

The INA grants aliens the right to petition for judicial review of a "final order of removal," 8 U.S.C. § 1252(a)(1), which the statute defines in relevant part as "a determination by the [BIA] affirming" an order "concluding that the alien is deportable or ordering deportation." §§ 1101(a)(47)(B)(i), (A). Should a petitioner also seek review of a motion to reconsider, that review "shall be consolidated with the review of the order" itself. § 1252(b)(6). In cases involving a removal order and a motion to reconsider, the statute thus "contemplates two petitions for review and directs the courts to consolidate the matters." *Stone v. INS*, 514 U.S. 386, 394 (1995).

Of course, only one petition for review faces us here. The Government maintains that we lack jurisdiction over that petition because the removal order before us no longer represents the BIA's "final statement on the issues." Respondent's Br. 35. It therefore urges us to dismiss the petition as moot, or in the alternative, to remand to the BIA to "clear up any jurisdictional difficulties." Respondent's Br. 30.

These arguments fail. The Supreme Court has emphasized that "deportation orders are to be reviewed in a timely fashion after issuance, irrespective of the later filing of a motion to . . . reconsider." *Stone*, 514 U.S. at 394. Congress has provided for judicial review over any final removal order, whether or not the BIA later supplements its reasoning in a separate order. *See id.* at 405 (noting that the INA "reflects Congress' understanding that a deportation order is final, and reviewable, when issued" and that such an order's "finality is not affected by the subsequent filing of a motion to reconsider"). This is particularly true because the BIA *denied* the Crespins' motion to reconsider, leaving the original removal order wholly intact. *See Plasencia-Ayala v. Mukasey*, 516 F.3d 738, 745 (9th Cir. 2008), *overruled on other grounds by Marmolejo-Campos v. Holder*, 558 F.3d 903 (9th Cir. 2009) (observing that "courts have uniformly found that the denial

of a motion to reconsider . . . does not affect federal court jurisdiction over the underlying removal order"). We therefore possess jurisdiction to review that removal order.

We similarly discern no reason to remand the case to the BIA before considering the challenged removal order. In other cases, where we could not "review the BIA's decision because the BIA ha[d] given us nothing to review," we have remanded to the BIA, explaining that such remands often become necessary "when the issue at hand has not been addressed on all sides by the BIA." *Li Fang Lin v. Mukasey*, 517 F.3d 685, 693-94, 694 n.12 (4th Cir. 2008). Such is not the situation here; rather, the BIA has explained, in detail, its reasons for ordering the Crespins' removal. A simple remand for clarification would do little to illuminate the BIA's well-developed position. It would, however, further delay the ultimate resolution of the Crespins' asylum application, running afoul of the Supreme Court's instruction that "Congress' fundamental purpose" in creating the INA's review provisions was "to abbreviate the process of judicial review." *Stone*, 514 U.S. at 399 (internal quotations omitted). More than twenty months have already elapsed since the BIA issued its removal order; we decline to delay the proceedings further by ordering a pointless remand.

B.

The Crespins, for their part, argue that we must limit our review to the reasoning articulated by the BIA in the removal order itself. They point out that "a reviewing court . . . must judge the propriety of [agency] action solely by the grounds invoked by the agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). According to the Crespins, this principle forecloses us from assessing the rationales supplied by the BIA in its subsequent order, which the Crespins did not appeal.

We acknowledge, of course, that the BIA's order denying reconsideration is not before us. *See Stone*, 514 U.S. at 395

(explaining that a reconsideration motion requires a "separate petition[ ] for review"). We also recognize that if the BIA acts on improper grounds, we are "powerless to affirm . . . by substituting what [we] consider[ ] to be a more adequate or proper basis." *Chenery*, 332 U.S. at 196; *see also INS v. Ventura*, 537 U.S. 12, 16-18 (2002) (per curiam) (applying *Chenery* to asylum determinations).

That said, a court must not stretch the *Chenery* principle so far that it becomes "an idle and useless formality." *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969). Here, to turn a blind eye to the BIA's denial of reconsideration would constitute just such an "idle and useless" exercise. *See de Jesus Melendez v. Gonzales*, 503 F.3d 1019, 1023 n.1 (9th Cir. 2007) (addressing the rationale of the BIA's denial of reconsideration even though the denial itself was not before the panel); *Alam v. Gonzales*, 438 F.3d 184, 186-88 (2d Cir. 2006) (same). Indeed, limiting our review to the reasoning contained in the original removal order would undoubtedly prompt the BIA, on remand, to reinstitute the order based on the very reasons it set forth in its denial of reconsideration. *See id.* Ignoring that reasoning accomplishes nothing, because "the result of a remand to the Board," which is the only relief available to the Crespins, "is a foregone conclusion." *Hussain v. Gonzales*, 477 F.3d 153, 158 (4th Cir. 2007). Our assessment of the BIA's additional reasoning eliminates the need for such a wasteful remand. And because we analyze only the *reasoning* already articulated by the BIA,[3] and thus need not "guess at what [the] agency meant to say," *Nken v. Holder*, 585 F.3d 818, 822 (4th Cir. 2009), our decision in no way "propel[s] the court into the domain . . . [of] the administrative agency." *Chenery*, 332 U.S. at 196.

---

[3]The INA's requirement that we "decide the petition only on the administrative record on which the order of removal is based" is not to the contrary. 8 U.S.C. § 1252(b)(4)(A). We can and do evaluate the reasoning contained in the BIA's denial of reconsideration without looking to evidence outside the original administrative record.

Accordingly, we turn to the merits of the removal order, taking into account the reasons for that removal laid out in both the original order and the denial of reconsideration.

## III.

The INA permits the Attorney General to grant asylum to any refugee who applies. 8 U.S.C. § 1158(b)(1)(A). To qualify as a refugee, an asylum seeker must demonstrate that he is "unable or unwilling to return to" his native country because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." § 1101(a)(42)(A).

We may vacate a denial of asylum only if it is "manifestly contrary to law." 8 U.S.C. § 1252(b)(4)(C). Although we accept factual findings unless "any reasonable adjudicator would be compelled to conclude to the contrary," § 1252(b)(4)(B), we review the BIA's legal conclusions *de novo*. *See Marynenka v. Holder*, 592 F.3d 594, 600 (4th Cir. 2010). Thus, "we afford substantial—but not unlimited—deference to the Board's decision." *Essohou v. Gonzales*, 471 F.3d 518, 520 (4th Cir. 2006).

Here, the BIA articulated four reasons for vacating the IJ's grant of asylum, deciding that: (1) Crespin alleged membership in no "particular social group"; (2) Crespin suffered only harassment, not persecution; (3) Crespin's membership in the putative social group did not motivate his asserted persecution; and (4) the Salvadoran government was willing and able to prevent Crespin's mistreatment. We consider each of these in turn.

## A.

The INA does not expressly define the term "particular social group," but we have recently considered its meaning. *See Lizama v. Holder*, ___ F.3d ___, No. 09-2027 (4th Cir.

2011).[4] We there concluded that *Chevron* deference should be accorded to the BIA's long-standing interpretation of "particular social group" as "a group of persons all of whom share a common, immutable characteristic," *Matter of Acosta*, 19 I. & N. Dec. 211, 233 (BIA 1985), *overruled on other grounds by Matter of Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987). *See Lizama*,___ F.3d at ___. This "immutability" test, first articulated in the BIA's seminal *Acosta* case, requires that group members share a characteristic that "the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." 19 I. & N. Dec. at 233.

The Crespins' proposed group satisfies this test. *Acosta* itself identifies "kinship ties" as paradigmatically immutable, *see id.*, and the BIA has since affirmed that family bonds are innate and unchangeable. *See In re C-A*, 23 I. & N. Dec. 951, 959 (BIA 2006); *In re H-*, 21 I. & N. Dec. 337, 342 (BIA 1996) (accepting "clan membership" as a particular social group because it was "inextricably linked to family ties"). Accordingly, every circuit to have considered the question has held that family ties can provide a basis for asylum. *See Al-Ghorbani v. Holder*, 585 F.3d 980, 995 (6th Cir. 2009); *Ayele v. Holder*, 564 F.3d 862, 869 (7th Cir. 2009); *Jie Lin v. Ashcroft*, 377 F.3d 1014, 1028 (9th Cir. 2004); *Gebremichael v. INS*, 10 F.3d 28, 36 (1st Cir. 1993). We agree; the family provides "a prototypical example of a 'particular social group.'" *Sanchez-Trujillo v. INS*, 801 F.2d 1571, 1576 (9th Cir. 1986).

The BIA committed legal error by concluding to the contrary. That error flowed from the fact that, as the Government concedes, the BIA's removal order rejected a group different

---

[4]Although one previous panel did analyze the term and held that the "family constitutes a particular social group," *see Lopez-Soto v. Ashcroft*, 383 F.3d 228, 235 (4th Cir. 2004) (internal quotation marks omitted), we vacated its judgment when deciding to rehear the case *en banc*, and the parties subsequently settled and dismissed the case.

from that which the Crespins proposed. The BIA concluded that "those who actively oppose gangs in El Salvador by agreeing to be prosecutorial witnesses" does not constitute a cognizable social group. But the Crespins did not so contend. Rather, they maintained, and continue to maintain, that *family members* of those witnesses constitute such a group. The BIA later essentially admitted this error, acknowledging in its denial of Crespin's motion to reconsider that it does "not dispute that family membership can give rise to membership in a particular social group under certain circumstances." The BIA nonetheless affirmed its original order, asserting that the Crespins' proposed social group was insufficiently "particular[ ]" because "anyone who testified against MS-13, as well as all of their family members, would potentially be included." Again the BIA inaccurately characterized the Crespins' proposed social group. Indeed, the Crespins' proposed group *excludes* persons who *merely testify* against MS-13; the Crespins' group instead encompasses only the relatives of such witnesses, testifying against MS-13, who suffer persecution on account of their family ties. The BIA never explained why this group stretches beyond the bounds of particularity.

Moreover, the precedent on which the BIA relied requires only that "the group have particular and well-defined boundaries" such that it constitutes a "discrete class of persons." *Matter of S-E-G-*, 24 I. & N. Dec. 579, 582, 584 (BIA 2008). The family unit –- centered here around the relationship between an uncle and his nephew –- possesses boundaries that are at least as "particular and well-defined" as other groups whose members have qualified for asylum. *See, e.g.*, *Urbina-Mejia v. Holder*, 597 F.3d 360, 365-66 (6th Cir. 2010) (former gang members); *Tapiero de Orejuela v. Gonzales*, 423 F.3d 666, 672 (7th Cir. 2005) ("the educated, landowning class of cattle farmers"); *Safaie v. INS*, 25 F.3d 636, 640 (8th Cir. 1994) ("Iranian women who advocate women's rights or who oppose Iranian customs relating to dress and behavior"), *superseded by statute on other grounds,* Illegal Immigration

Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009, *as recognized in Rife v. Ashcroft*, 374 F.3d 606, 614 (8th Cir. 2004).

Finally, the BIA opined that the proposed group lacked the requisite "social visibility" of a particular social group. This was also error.[5] Indeed, the BIA itself has previously stated that "[s]ocial groups based on innate characteristics such as . . . family relationship are generally easily recognizable and understood by others to constitute social groups." *In re C-A*, 23 I. & N. Dec. at 959. In fact, we can conceive of few groups more readily identifiable than the family. *See Sanchez-Trujillo*, 801 F.2d at 1576. This holds particularly true for Crespin's family, given that Crespin and his uncle publicly cooperated with the prosecution of their relative's murder.

In sum, the BIA's conclusion that Crespin failed to demonstrate his membership in a "particular social group" was manifestly contrary to law.

## B.

The INA further requires that an asylum seeker demonstrate that his removal would subject him to a "well-founded fear of persecution." 8 U.S.C. § 1101(a)(42)(A). To do so, an asylum seeker must establish both a genuine subjective fear of persecution and that "a reasonable person in like circumstances would fear persecution." *Chen v. INS*, 195 F.3d 198, 201-02 (4th Cir. 1999). Such a showing does not require that an applicant prove it more likely than not that he will suffer persecution, because "[o]ne can certainly have a well-founded

---

[5]We note that the Seventh Circuit has rejected the BIA's "social visibility" requirement for cognizable social groups. *See Ramos v. Holder*, 589 F.3d 426 (7th Cir. 2009); *Gatimi v. Holder*, 578 F.3d 611 (7th Cir. 2009). Because we hold that the family satisfies the BIA's visibility criterion, however, we need not decide whether that criterion comports with the INA. *See Lizama*, ___ F.3d at ___ (declining to evaluate the reasonableness of BIA's visibility requirement).

fear of an event happening when there is less than a 50% chance of the occurrence taking place." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987). Instead, an alien need only show that his removal would create a "reasonable possibility" –- as low as a ten percent chance—of persecution. *Id.* at 440 (quoting *INS v. Stevic*, 467 U.S. 407, 425 (1984)).

Crespin made that showing here. As the IJ observed, Crespin received two notes stating MS-13's intent to kill him, and one gang member declared the same to his face. The IJ also credited Crespin's evidence of gang violence in El Salvador, which tended to show that MS-13 members often attack their enemies' families and that they have previously murdered prosecutorial witnesses. Furthermore, the IJ noted that "although the prosecution for [Crespin's] cousin's murder is over for now, two gang members involved in the shooting are still on the loose, including the shooter," creating a "reasonable possibility that the gang members would seek" to attack Crespin. The IJ thus concluded that, should Crespin return to El Salvador, there was a reasonable possibility that MS-13 would "take steps to harm or kill" him.

On appeal, the BIA—although not disputing the sincerity of Crespin's subjective fear—rejected his fear of persecution as objectively unreasonable. The BIA reasoned that Crespin had suffered "mere threats and harassment" and had shown only "[a] generalized fear of harm," neither of which it thought amounted to a well-founded fear of persecution. This conclusion contravenes our express holding that the "threat of death" qualifies as persecution. *Li v. Gonzales*, 405 F.3d 171, 177 (4th Cir. 2005) (internal quotations omitted). Because Crespin has received three such threats, he is "presumed to have a well-founded fear of future persecution." *Id.* at 176. Moreover, the parallel threats directed at Crespin's aunt and uncle strengthened the objective reasonableness of his fear. *See Baharon v. Holder*, 588 F.3d 228, 232 (4th Cir. 2009) (noting that "threats to one's close relatives is an important factor in deciding whether mistreatment sinks to the level of

persecution"). The BIA thus erred in rejecting the IJ's conclusion that the unrebutted evidence of death threats against Crespin and his family members, combined with MS-13's penchant for extracting vengeance against cooperating witnesses, gave rise to a reasonable fear of future persecution.

The BIA's observation that "the criminal activities of MS-13 affect the population as a whole" is beside the point.[6] Crespin complains not of a fear of the general "criminal activities" of MS-13, but of a series of targeted and persistent threats directed at him and his family. *Cf. Huaman-Cornelio v. BIA*, 979 F.2d 995, 1000 (4th Cir. 1992) (upholding rejection of asylum claim based on "general conditions of upheaval and unrest").

Given the undisputed evidence of targeted death threats, and that Crespin need only show a reasonable possibility—not a likelihood—of future persecution, we hold that the BIA's conclusion that Crespin failed to demonstrate a well-founded fear of future persecution was also manifestly contrary to law.

## C.

In addition to imposing the above requirements, the INA mandates that those who seek refugee status demonstrate that they fear persecution "on account of" a protected ground. 8 U.S.C. § 1101(a)(42)(A). Persecution occurs "on account of" a protected ground if that ground serves as "at least one central reason for" the feared persecution. § 1158(b)(1)(B)(i).

---

[6]Nor does the fact that Crespin's children remained unharmed in El Salvador while he first visited the United States undermine the reasonableness of Crespin's own fear of persecution, for Crespin's fear is premised on threats directed at him personally. Moreover, the children escaped persecution for a mere two month period, hardly a time long enough to engender confidence that Crespin can safely return to El Salvador. *Cf. In re A-E-M*, 21 I. & N. Dec. 1157, 1160 (BIA 1998) (rejecting claim in part because a relative safely remained in asylum seeker's native country for four years).

Although Crespin need not show that his family ties provide "*the* central reason or even a dominant central reason" for his persecution, he must demonstrate that these ties are more than "an 'incidental, tangential, superficial, or subordinate' reason" for his persecution. *Quinteros-Mendoza v. Holder*, 556 F.3d 159, 164 (4th Cir. 2009) (quoting *In re J-B-N-*, 24 I. & N. Dec. 208, 214 (BIA 2007)).

The IJ found that "[a]t least one central reason why the gang members targeted [Crespin] was because of his uncle's cooperation with the Salvadoran government." The BIA disagreed, deciding that "[t]he evidence does not indicate that MS-13 targeted the respondents because they are related to someone who testified." Instead, according to the BIA, MS-13 "appear[s] to have intimidated [Crespin] so he would not testify himself."

There may, or may not, be an evidentiary basis for the BIA's conclusion. What is clear is that the BIA based that conclusion on its improper *de novo* review of the record. Indeed, the BIA neglected even to mention the IJ's considered finding that Crespin's relationship with his uncle centrally motivated his persecution; instead, it simply opined on the evidence anew. In doing so, the BIA violated the regulatory directive requiring it to review the IJ's factual findings only for clear error. *See* 8 C.F.R. § 1003.1(d)(3)(i).

The Government concedes that the BIA reviewed this question *de novo*. It maintains, however, that *de novo* review was proper because the issue under review was "whether the undisputed facts establish the necessary nexus." Respondent's Br. 52. The Government is wrong. The BIA disagreed with the IJ not because it rejected the IJ's legal interpretation of undisputed facts; rather, the BIA took a contrary view of the gang members' motivations—a classic factual question.[7] *See*

---

[7]The Government rightly observes that the statements accompanying the promulgation of 8 C.F.R. § 1003.1 explain that the review of "whether

*Singh v. Mukasey*, 543 F.3d 1, 4 (1st Cir. 2008); *Thuri v. Ashcroft*, 380 F.3d 788, 791 (5th Cir. 2004) (per curiam); Black's Law Dictionary 669 (9th ed. 2009) (defining "[f]acts" to "include not just tangible things, actual occurrences, and relationships, but also states of mind such as intentions and opinions"). Accordingly, the IJ's nexus determination qualified as a finding of fact entitled to deference. *See Massis v. Mukasey*, 549 F.3d 631, 636 n.6 (4th Cir. 2008) (restricting the BIA's "determination of what happened to the individual" to clear error review (internal quotation omitted)).

Because the BIA failed to review the IJ's nexus finding for clear error and instead "simply substituted its own judgment for that of the IJ," *Kabba v. Mukasey*, 530 F.3d 1239, 1246 (10th Cir. 2008), we must remand for consideration of this issue under the correct standard. *See id.* at 1249; *Padmore v. Holder*, 609 F.3d 62, 67 (2d Cir. 2010).

## D.

Finally, "persecution" under the INA encompasses harm inflicted by either a government or an entity that the government cannot or will not control. *See, e.g.*, *Burbiene v. Holder*, 568 F.3d 251, 255 (1st Cir. 2009); *Santos-Lemus v. Mukasey*, 542 F.3d 738, 742 (9th Cir. 2008); *Menjivar v. Gonzales*, 416 F.3d 918, 921 (8th Cir. 2005); *Bace v. Ashcroft*, 352 F.3d 1133, 1138-39 (7th Cir. 2004); *Acosta*, 19 I. & N. at 222.[8] The

---

the harm was inflicted 'on account of' a protected ground . . . will not be limited by the 'clearly erroneous' standard." Board of Immigration Appeals: Procedural Reforms to Improve Case Management, 67 Fed.Reg. 54,878, 54,890 (Aug. 26, 2002). Those same statements, however, provide that the BIA may not review *de novo* the factual question of "'what happened' to the individual." *Id.* Here, the IJ's nexus finding centered on its factual assessment of what happened to Crespin; the BIA must therefore review that finding for clear error.

[8]In the course of rejecting a draft resister's asylum claim, we previously noted that "[m]isconduct by renegade military units" did not amount to cognizable persecution because it was not "connected with official govern-

IJ, although not expressly acknowledging this requirement, identified a litany of reasons as to why attempts by the Salvadoran government to control gang violence have proved futile. Rather than review those findings for clear error, however, the BIA concluded—without elaboration—that a State Department report "demonstrates that the Salvadoran government has focused law enforcement efforts on suppressing gang violence." On that basis alone, the BIA found that the Crespins "have not shown that the government would be unable or unwilling to protect them from MS-13."

This cursory conclusion suffers from the same defect that plagued the BIA's nexus finding. "Whether a government is 'unable or unwilling to control' private actors . . . is a factual question that must be resolved based on the record in each case." *Menjivar*, 416 F.3d at 921; *see also Kaplun v. Att'y Gen. of United States*, 602 F.3d 260, 270 (3d Cir. 2010) (noting that "a finding of fact by an IJ includes expressions of likelihood based on testimony . . . and/or documentary evidence"). Accordingly, the BIA should have reviewed the IJ's finding for clear error.

## IV.

For the foregoing reasons, we grant the petition for review and remand the case to the BIA with instructions that it review for clear error the IJ's findings that Crespin's persecu-

---

mental policy." *M.A. v. INS*, 899 F.2d 304, 312 (4th Cir. 1990) (en banc). We thus refused to "inquir[e] into the government's 'control' over forces within its borders." *Id.* at 314. There, however, we relied on the unique status of draft evasion in international law, *see id.* at 312, and declined to "formulate general legal prescriptions for . . . claims of asylum" outside of that context. *Id.* at 314. Moreover, the regulations make clear that the INA encompasses persecution not sponsored by government. *See* 8 C.F.R. § 208.13(b)(3)(i) (requiring applicant to show unreasonability of internal relocation "unless the persecution is by a government or is government-sponsored").

tion was "on account of" his family ties and that the Salvado-
ran government is unable or unwilling to control MS-13's
activities.

*PETITION FOR REVIEW GRANTED;*
*REMANDED FOR FURTHER PROCEEDINGS*