UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 15-2576

EVELYN JOSSELY GOMEZ VILLATORO; CHRISTER JASUAT GOMEZ
VILLATORO,

Petitioners,

v.

JEFFERSON B. SESSIONS III, Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: December 6, 2016                    Decided: March 2, 2017

Before KING, SHEDD, and FLOYD, Circuit Judges.

Petition for review granted in part and denied in part; remanded for further proceedings
by unpublished opinion. Judge Floyd wrote the majority opinion, in which Judge King
joined. Judge Shedd wrote a separate opinion concurring in part and dissenting in part.

**ARGUED**: Jasper Jimmy Nzedu, JASPER ATTORNEYS & ASSOCIATES, PLLC,
Alexandria, Virginia, for Petitioners. Julia Tyler, UNITED STATES DEPARTMENT
OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF**: Benjamin C. Mizer,
Principal Deputy Assistant Attorney General, Russell J.E. Verby, Senior Litigation
Counsel, Monica Antoun, Office of Immigration Litigation, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

Unpublished opinions are not binding precedent in this circuit.

FLOYD, Circuit Judge:

Petitioners Evelyn Gomez-Villatoro ("Gomez") and her minor son, C. J. Gomez-Villatoro, citizens and natives of Honduras, had their asylum petitions rejected by both an Immigration Judge (IJ) and the Board of Immigration Appeals (BIA). Because the BIA's decision represents a misapplication of our precedent, we reverse, and remand with instructions to grant the asylum petitions.

I.

A.

Gomez and her minor son, citizens and natives of Honduras, entered the United States on or about September 25, 2012, when Gomez was nineteen years old and her son was three months old. They entered on B-2 tourist visas that required them to depart the United States on or before December 25, 2012. However, both overstayed their visas. On or about January 7, 2013, Gomez filed an application for asylum, including her minor son as a derivative applicant.[1] In addition to seeking asylum, Gomez sought removal of withholding, as well as protection under the Convention Against Torture (CAT).[2] Gomez

---

[1] As Gomez's son's applications are all derivative of her own claims, the remainder of this memorandum will refer only to Gomez.

[2] United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, *opened for signature* Dec. 10, 1984, 1465 U.N.T.S. 85 (entered into force in United States Nov. 20, 1994); *see also* 136 Cong. Rec. S17,486, 17,491–92 (daily ed. Oct. 27, 1990) (Senate understandings on ratification); Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277 § 2242, 112 Stat. 2681, 2822–23 (implementing legislation); 8 C.F.R. § 1208.18 (implementing regulations).

3

appeared to base her claims on her father's and her brother's religious activities, and on her membership in her family. During the pendency of her application, Gomez gave birth to a second child in the United States, who is a citizen by birth.

After initial procedural issues, Gomez eventually appeared for a hearing on August 19, 2014, before IJ David W. Crossland in Baltimore, Maryland. The IJ denied her application in full. Gomez then appealed to the BIA which dismissed the appeal in a single-judge written order and opinion on December 3, 2015, affirming the IJ's decision. Gomez now petitions this Court for relief, and we exercise jurisdiction pursuant to Section 242 of the Immigration and Nationality Act (INA), 8 U.S.C. § 1252.

## B.

In Honduras, Gomez was part of a fairly well-off family. The family owned a working farm that employed six to eight people and had approximately 200 head of cattle in addition to several chickens and hogs. Gomez and her family were also active members of the Evangelical Church in their community, located in Sonaguera within the Department of Colón. According to Gomez, her father led the men's fellowship group, where he would preach that it was against their Christian faith to pay money to gangs and also warned the men not to support the gangs. Gomez further alleged that beginning in 2010, when she was seventeen, she and her family began receiving threats from members of MS-13, a prominent gang in Honduras. Gomez alleged and testified that it was because of these religion-based threats made against her family, and the ensuing deaths of her father and brother, that she feared return to Honduras.

4

At her hearing, Gomez explained to the IJ that her father received threatening texts from the gangs demanding that he stop preaching, which her father showed to her brother, and which her brother then told her about. Gomez's father was subsequently killed on July 5, 2011—when Gomez was seventeen years old—allegedly by members of MS-13. In April 2012, after her father's death, Gomez came to the United States on a tourist visa, and then returned to Honduras. When asked why she did not file for asylum at that point, she told the IJ that she "thought that after that, things were going to be calmer," and that she "didn't think they were going to continue receiving threats." A.R. 96.[3]

Gomez also testified at her hearing that her brother began preaching against the gangs once her father was killed, and that soon after her brother also received threatening text messages about preaching. These texts messages were not seen by Gomez either, but instead shown to the brother's friend, who told Gomez's mother, who ultimately told Gomez. Gomez's brother was then killed on June 18, 2012, also allegedly by members of MS-13. Following the death of Gomez's brother, Gomez's mother entered the United States alone. Gomez's mother filed an asylum request at that time. Gomez then entered the country, as mentioned above, on or about September 25, 2012.

Gomez testified to the IJ that she feared persecution by members of the MS-13 gang because of her father and brother, and that "what [the gang members] wanted to do

---

[3] Citations to the "A.R." refer to the Administrative Record of the proceedings below filed by the parties in this appeal.

was punish him and all of us because of the—of his preachings." A.R. 102. The IJ then further asked, "So why would they kill you now?" to which Gomez replied, "Because if we go back there, they are angry because of what my father used to preach about, and if we go back there, they're going to kill us all as well." *Id.* Gomez also related to the IJ that members of MS-13 once stopped her when leaving school after her father had been killed and told her that "the next one dying, it was going to be [her]." A.R. 97–98. She also told the IJ that once her father and brother were deceased, her mother received the same threatening text messages her father and brother used to receive. She testified that the messages only stopped when her mother changed phone numbers.

Gomez told the IJ that she was not aware of anyone else in her community of approximately 6,000 people being threatened by the gangs, nor was she aware of anyone specifically in her church of between 40 and 50 people being threatened by the gangs. The IJ took issue with this assertion. He asked Gomez to explain why her father and brother would be preaching to the members of the church about a problem with gangs such that they brought significant trouble upon themselves if there was never an issue with gangs in the first place, to which Gomez replied that she was young at the time and was simply unaware.

The IJ then asked Gomez specifically, "W[ere] your father and family targeted for money because of your, your—the standard of living you enjoyed and what may have been a fairly high standard of living and success?" to which Gomez replied, "No, it, it was because of what my father was preaching about." A.R. 114.

6

Despite being prepared to testify at the hearing, Gomez's mother did not testify because she had her asylum hearing the following week before the same IJ. However, she did submit a written affidavit on behalf of Gomez. Gomez also submitted her own sworn affidavit into the record, in addition to her own live testimony before the IJ. In their affidavits, Gomez and her mother both stated that the family received threats that they would all be killed if Gomez's father did not pay the gangs, and that the threats were motivated by religious preaching. A.R. 154 ¶¶ 9–10, 162 ¶¶ 10–11. They also both stated that the gangs called and sent messages at odd times "stating that they knew exactly where [the family members] were," and that they would see the gangs soon if they refused to pay. A.R. 154 ¶ 13, 162 ¶ 14. Gomez's mother also stated that the threats from the gangs were that she and her children "would follow the path of [her] husband if [they] did not pay the money [the gangs] had demanded." A.R. 162 ¶ 16.

The record also contained affidavits from the head of Gomez's evangelical church, as well as friends and family from Honduras. The pastor stated that Gomez's mother was forced to leave the country, but did not offer that Gomez's father and brother were killed due to their pastoral activities. *See* A.R. 207. Similarly, neighbors referred only to the refusal to pay a "war tax," and never mentioned religious activities. *See* A.R. 213, 219, 225, 230, 236. Some neighbors did, however, note that Gomez continued to be targeted by the gangs due to her family ties. *See* A.R. 225, 230, 236. Finally, Gomez's aunt—her father's sister—stated that Gomez's father and brother were killed because the gangs desired to "take their properties." A.R. 242.

Based on the record and testimony, the IJ found Gomez's testimony regarding preaching not credible, and rejected her religion-based asylum claim. The IJ explained in his holding that he "simply d[id] not find it plausible" that Gomez's father and brother would preach about resisting extortion efforts in light of Gomez's testimony that she was unaware of any extortion efforts targeting anyone else in the church. A.R. 53–54. The IJ explained further in his holding:

> [I]ndeed, the minister of the organization, which . . . presumably would have . . . allowed the head of the men's group . . . to preach. He has had no problem, according to [Gomez], nor has the church had a problem. Indeed, according to [Gomez], [she] is unaware of any efforts by the gang to recruit people from her high school. She is unaware of the gang activities of extorting persons in the community; and therefore, the Court does not find [Gomez]'s testimony credible for lack of plausibility that the death of the father and the death of the brother were related to their allegedly preaching. The Court, however, does note that unlike the vast majority of the people living in Honduras, this family seems to be [a] rather wealthy family . . . [thus] any extortion efforts were because of [the family's] perceived wealth [and] ability to pay money, not because of any religious activities. Therefore, the Court does not find that the respondent's father and brother were killed on account of any alleged volunteer preaching they did. It is not plausible that nobody else in the church would have been targeted, especially the minister would not have been targeted.

A.R. 54.

Turning to the social group asylum claim, the IJ did make a finding that Gomez "is a member of a particular social group, that is a member of a particular family." A.R. 53. However, the IJ found that "the threat for money was a clear criminal extortion because of the economic standing of [Gomez]'s family in the community and not because of any religious activities, and the Court does not find that the action of the gang members in

extorting money from family members would create a nexus, resulting in a grant of asylum to [Gomez]." A.R. 54.

Finding that Gomez failed to make out her asylum claim, the IJ reasoned she would not be able to meet the higher burden of demonstrating withholding of removal, and denied that claim. A.R. 55. The IJ then denied relief under CAT, finding "there is no showing that the government of Honduras would cause [Gomez] any harm, nor is there any showing that the government of Honduras could not or would not provide protection to [Gomez] were she to return to Honduras." *Id.*

On appeal to the BIA, the BIA declined to disturb the IJ's credibility and factual findings with respect to the motivation for threatening and killing Gomez's father and brother. The BIA concluded that the IJ's finding that extortion was the motivation was "not clearly erroneous as it is supported by [Gomez]'s own testimony." A.R. 4. The BIA also found the IJ's finding about motivation supported by substantial evidence in the record, including the failure of any affidavit submitted by Gomez—other than her own and her mother's—to indicate religion or preaching as a basis for her family being targeted, and referring only to criminal extortion as a basis for targeting, and her father and brother being killed for failure to pay extortion money. A.R. 4–5. The BIA additionally upheld the IJ's ruling with respect to the social group asylum claim, again concluding that no asylum was warranted because Gomez "did not demonstrate [that] her religion or familial connection were central reasons for the extortion demands and death threat." A.R. 5–6.

9

In support of both of these determinations, the BIA cited our opinion in *Cordova v. Holder*, 759 F.3d 332 (4th Cir. 2014), for the proposition that "threats prompted by greed and a desire to extort money are not on account of the alien's membership in a family or any particular social group," and that "extortion demands, without substantial evidence of a familial motivation, do not establish nexus to a protected category." A.R. 5–6. Finally, the BIA agreed with the IJ's findings with respect to the CAT claim. A.R. 6.

## II.

We have previously elucidated the standard for reviewing a decision of the BIA that dismisses an appeal from an IJ by written opinion:

> When, as here, the BIA adopts and affirms the IJ's decision and supplements it with its own opinion, we review both decisions. *Ai Hua Chen v. Holder*, 742 F.3d 171, 177 (4th Cir. 2014). We review factual findings for substantial evidence, treating them as conclusive "unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* at 178 (quoting 8 U.S.C. § 1252(b)(4)(B)). We review legal conclusions de novo. *Crespin-Valladares v. Holder*, 632 F.3d 117, 124 (4th Cir. 2011). We must uphold the BIA's decision unless it is "manifestly contrary to law and an abuse of discretion." *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011). The BIA abuses its discretion if it fails "to offer a reasoned explanation for its decision, or if it distort[s] or disregard[s] important aspects of the applicant's claim." *Id.* We may not affirm the BIA's decision on any conceivable basis, but rather only if "the grounds upon which the agency acted . . . were those upon which its action can be sustained." *Nken v. Holder*, 585 F.3d 818, 822 (4th Cir. 2009) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)).

*Cordova,* 759 F.3d at 337 (alterations in original).

Additionally, to the extent the BIA opinion inteprets the INA, has been issued by a single member, and is non-precedential, it "is not entitled to *Chevron*[4] deference; only *Skidmore*[5] deference applies." *Id.* at 337 n.3 (citing *Martinez v. Holder*, 740 F.3d 902, 909–10 (4th Cir. 2014)).  The extent of our deference to the BIA "depends upon the thoroughness evident in the BIA's consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it the power to persuade." *Id.* (internal quotations and alterations omitted).

III.

Gomez argues that the IJ and the BIA incorrectly determined that (1) she was not credible with respect to the religious motivation she alleged was behind the gangs threatening and killing her father and brother; and (2) she was not subject to persecution due to her membership in a particular social group consisting of her immediate family.  In addition to arguing the propriety of the decision, the government also submits that Gomez has procedurally defaulted on her social group claim of error.  For the reasons explained herein, we hold that Gomez's social group claim of error is successful, and we will waive the procedural default, finding that a miscarriage of justice would otherwise occur.

---

[4] *Chevron, U.S.A. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

[5] *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

## A.

An asylum applicant must demonstrate that he or she was persecuted or has "a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1). In order to establish eligibility for withholding of removal, an applicant must show that "the alien's life or freedom would be threatened in [the alien's home country] because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1231(b)(3)(A); *see also* 8 C.F.R. § 1208.16(b). "An applicant 'who has failed to establish the less stringent well-founded fear standard of proof required for asylum relief is necessarily also unable to establish an entitlement to withholding of removal.'" *Marynenka v. Holder*, 592 F.3d 594, 600 (4th Cir. 2010) (quoting *Anim v. Mukasey*, 535 F.3d 243, 253 (4th Cir. 2008)).

Under both standards, "the applicant must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be *at least one central reason* for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i) (emphasis added); *see also Crespin-Valladares*, 632 F.3d at 127; *In re C-T-L-*, 25 I. & N. Dec. 341, 348 (B.I.A. 2010).

## B.

Despite being the primary focus of Gomez's petition, there is no meritorious claim based on the fear of religious persecution. Gomez makes no claim that she herself will be persecuted because of her religion; rather, she claims that because of her father's and her

brother's religious activities, she will be persecuted. She argues that this provides the basis for a successful claim for asylum and withholding of removal, but we disagree.

As we have held, the issue of "the gang members' motivations [is] a classic factual question" governed by the substantial evidence standard. *Crespin-Valladares*, 632 F.3d at 127–28 (citations omitted). Similarly, an "adverse credibility finding is also subject to the substantial evidence standard." *Munyakazi v. Lynch*, 829 F.3d 291, 298 (4th Cir. 2016). The IJ made a credibility determination, and found that Gomez's testimony was not credible based on the record before him. The IJ based this credibility determination on the implausibility of Gomez's testimony that her father and brother were threatened because of their religious activities, and not because of the family's relative wealth and status among the church and the community in general. The IJ found the testimony implausible because Gomez was unable to identify anyone else targeted because of religious beliefs, including the pastor, and because the affidavits submitted by friends and family all indicated a failure to pay extortion money and a desire to obtain the Gomez family properties as the basis for MS-13 threatening and ultimately killing Gomez's father and brother.

Gomez argues that the IJ failed to credit her youth as a basis for being unaware of the situation of people in her church and community, but this argument misses the point. The overwhelming weight of the evidence in the record supports the IJ's determination as affirmed by the BIA. It was not a clearly erroneous determination, as not a single person aside from Gomez or her mother submitted testimony that Gomez's father and brother were persecuted because of their religious activities. This conclusion is further

13

supported, as recognized by the IJ and the BIA, by the fact that the head pastor of the church—who was the pastor during all times relevant to Gomez's claims and as far as the record reveals is still the pastor—makes *no mention* of Gomez's father or brother even conducting pastoral activities in the affidavit he submitted. As the BIA explained:

> Most notable are the statements from family and friends in Honduras, including the pastor of [Gomez]'s church, that consistently indicate [Gomez] and her family were targeted by the street gang due to criminal extortion, and her father and brother were killed due to their refusal to pay extortion. None of these statements, including the pastor's, corroborate that [Gomez]'s father or brother led a men's group at their church and publicly preached against the gang activity or paying extortion.

A.R. 5 (citations omitted). The credibility determinations of both the IJ and the BIA are supported by substantial evidence, and we affirm. In light of the adverse credibility finding on this issue, Gomez cannot make out a claim of a well-founded fear based on religious persecution, and we deny her petition as to this issue.

## C.

### 1.

Before reaching the merits of the second issue in Gomez's petition, we must first address a procedural issue. The government in its opposition brief asserts that Gomez's opening brief only dealt with the religious aspects of her asylum claim, and although she referred to her family, never specifically argued that the BIA erred in rejecting her social group asylum claim. As a result, the government submits that "to the extent Gomez did not argue persecution on account of her membership in a particular social group consisting of her immediate family, Gomez waived this argument." Resp.'s Br. at 19–20.

14

Gomez replied that her petition did argue a fear of persecution due to membership in a particular social group consisting of her immediate family, but if she did not do so sufficiently, she requests we review the argument to avoid a miscarriage of justice. Pet'r's Reply Br. at 11–12.

Rule 28 of the Federal Rules of Appellate Procedure and this Court's own precedent establish a general rule that "contentions not raised in the argument section of the *opening brief* are abandoned." *Suarez-Valenzuela v. Holder*, 714 F.3d 241, 249 (4th Cir. 2013) (quoting *A Helping Hand, LLC v. Balt. Cty.*, 515 F.3d 356, 369 (4th Cir. 2008)) (internal quotations omitted). However, we have also explained that we may "overlook" this rule "if [we] determine that a 'miscarriage of justice' would otherwise result." *Id.* (quoting *A Helping Hand*, 515 F.3d at 369) (internal quotations omitted). In determining what constitutes a "miscarriage of justice," we typically ask a petitioner to explain his or her failure to raise the argument earlier and why a miscarriage of justice would result absent our consideration of the argument. *Id.* However, even where not explained by the appellant, "if the error is 'plain' and if our refusal to consider such would result in the denial of fundamental justice," we may still consider the argument, even sua sponte. *Stewart v. Hall*, 770 F.2d 1267, 1271 (4th Cir. 1985) (citations omitted).

Gomez did brief the social group claim before the BIA, *see* A.R. 18–19, alleviating concerns that the error was not preserved for appellate review; however, she did not raise the issue in her opening brief to this court. Thus, under the normal application of our rules, the issue would be waived. *See Suarez-Valenzuela*, 714 F.3d at 249. Although Gomez does not explain why she failed to raise the argument earlier,

under these facts, her arguments for why this would constitute a miscarriage of justice are inextricably tied up in the merits of the argument for why the IJ and BIA erred in finding she did not make out a claim for asylum on the basis of social group membership.

When the matter is considered on the merits, as explained in Section III.C.2 of this Opinion, *infra*, the miscarriage of justice is apparent. As we explain below, the decisions of the BIA and the IJ are contrary to precedent and misapply our prior case law. In light of our eventual denial of Gomez's CAT claim in Section III.D, *infra*, rejecting this meritorious argument out of hand on procedural grounds would result in our affirming deportation of Gomez when she has a successful asylum claim. Not every single potentially meritorious argument that was procedurally waived need be evaluated by this Court, but we deem Gomez's argument the rare exception.[6] We will consider the merits of the argument and rule on it.

2.

Turning now to the merits of Gomez's claim, Gomez submits that she faced persecution and has a well-founded fear of future persecution in Honduras on the basis of membership in a particular social group consisting of her immediate family. We agree.

---

[6] This is not to suggest that any future panel need undertake a searching view of the record to find all potential issues on which the BIA could be reversed. We only hold today that under the specific facts of this case—i.e., where the petitioner has briefed the issue before us (albeit not in the opening brief), the respondent has had adequate opportunity to argue the issue, the BIA has ruled on the issue, the BIA has clearly misapplied precedent, and the issue is the sole determinative factor on whether the petitioner will be deported—not addressing the merits of the issue would be a miscarriage of justice.

The IJ made a factual determination that Gomez's "testimony is credible that she is a member of a particular social group, that is a member of a particular family." A.R. 53. The IJ went on to conclude that Gomez was not at risk of persecution due to her membership in the family because her father and brother were threatened because of their wealth. A.R. 54. This was upheld by the BIA, which relied on *Cordova* for the proposition that "threats prompted by greed and a desire to extort money are not on account of the alien's membership in a family or any particular social group." A.R. 5 (citing *Cordova*, 759 F.3d at 339–40). However, this misstates and misapplies our holding from *Cordova* and our continued development of social group-based asylum claims.

In *Cordova*, the alien's cousin and uncle were killed by a rival gang. 759 F.3d at 339. The BIA reasoned that because the cousin and uncle were not killed due to their family status, the alien could not have a fear of persecution based on his own family status. *Id.* We rejected this rationale, and held that a familial relationship could provide the basis for a well-founded fear of persecution when other family members were targeted for persecution, even if those other members were targeted "not because of their kinship ties." *Id.* We further explained that even though other family members "may not have been 'uniquely or specially targeted' . . . [that] does not undermine [an alien's] own fear of persecution." *Id.* (internal quotation marks omitted).

The BIA in *Cordova* also denied the alien's request for asylum on the basis that the alien was twice targeted by the gang for recruitment purposes unrelated to his uncle and cousin. *Id.* However, he was targeted an additional two times due to his association

17

with his cousin, a member of a rival gang. *Id.* We held that being targeted by gangs "for purposes of recruitment or extortion" and not related to kinship ties would not support a finding of asylum based on membership in a particular social group consisting of the alien's family. *Id.* at 339–40. However, if the targeting was connected to family relationships, as was the targeting of the alien in *Cordova*, then it would support a finding of asylum. *Id.* at 340.

Following *Cordova*, we have continued to clarify how a family tie may provide a basis for asylum. In *Hernandez-Avalos v. Lynch*, we reversed the BIA, finding that the alien's "relationship to her son is why she, and not another person, was threatened with death if she did not allow him to join [the gang], and the gang members' demands leveraged her maternal authority to control her son's activities." 784 F.3d 944, 950 (4th Cir. 2015). We further clarified that our holding was "not to say that every threat that references a family member is made on account of family ties . . . . [but] the two threats that directed [the alien] to turn her son over to the gang were meaningful only because of her maternal authority over her son's actions, and there is no evidence that she would have been selected as the recipient of those threats absent that familial connection." *Id.* at 950 n.7.

Here, Gomez and her mother have testified—either orally, via sworn declaration, or both—that Gomez was targeted for persecution by members of MS-13 because of her father and brother. This assertion was corroborated by the affidavits of friends and neighbors who did note that Gomez continued to be targeted by the gangs due to her family associations. *See* A.R. 225, 230, 236.

18

The BIA and the IJ improperly focused on whether Gomez's father and brother were threatened due to a protected reason in order to impute such protection to the whole family. This was in error. The correct analysis focuses on Gomez herself as the applicant, and asks whether Gomez was targeted because of her membership in the social group consisting of her immediate family. In other words, whether "she would have been selected as the recipient of those threats absent that familial connection." *Hernandez-Avalos*, 784 F.3d at 950 n.7. It is of no moment that the IJ made a finding of fact that the gang's motivation with respect to her father and brother was actually because of extortion and not religious activity, as we explained in both *Cordova* and *Hernandez-Avalos*.

The government similarly misses the mark, arguing that "the gang did not target anyone in the Gomez family because they belong to that family, but because the family has wealth that the gang wished to appropriate." Resp.'s Br. at 29. This misses our instruction from *Cordova* that the fact "that other members of [the alien]'s family may not have been 'uniquely or specially targeted' by MS-13 does *not* undermine [the alien]'s *own fear* of persecution." *Cordova*, 759 F.3d at 339 (emphases added). Gomez has established that her fear is based on threats made *to her* that specifically promised harm *to her* if members of the social group consisting of her immediate family, i.e. her father and brother, did not pay the extortion money.

The record is clear that Gomez's "relationship to her [father and brother] is why she, and not another person, was threatened with death if she [refused to acquiesce to the gang's demands]." *See Hernandez-Avalos*, 784 F.3d at 950. The IJ's conclusion to the contrary and the BIA's affirmance were in error as a misinterpretation and misapplication

19

of our case law. Gomez has made out a claim of a well-founded fear of persecution on account of her membership in a particular social group, as being a member of her family was at least one central reason for being targeted for persecution. Accordingly, we will grant the petition for review, reverse the BIA, and remand with instructions to the BIA to grant Gomez's asylum application on this ground.

## D.

The IJ and the BIA both based their determination on Gomez's application for withholding of removal solely on the denial of her asylum claim, on the basis that failure to carry the lighter burden on an asylum claim necessarily results in a failure to carry the heavier burden on a withholding of removal claim. A.R. 6, 55; *accord Marynenka*, 592 F.3d at 600 ("An applicant who has failed to establish the less stringent well-founded fear standard of proof required for asylum relief is necessarily also unable to establish an entitlement to withholding of removal." (internal quotations omitted)). Our precedent dictates that in this situation, where we reverse the BIA on a claim for asylum, we reverse and remand the decision of the BIA for reconsideration of the withholding of removal claim in the first instance. *Cordova*, 759 F.3d at 340 n.7 (citing *Li Fang Lin v. Mukasey*, 517 F.3d 685, 694 (4th Cir. 2008)).

## IV.

Gomez finally petitions this Court to reverse the determination that she did not make out a claim for protection under CAT. To qualify for CAT protections, an applicant must "establish that it is more likely than not that he or she would be tortured if

removed to the proposed country of removal. The testimony of the applicant, *if credible*, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 1208.16(c)(2) (emphasis added). "Torture" is later defined in the implementing regulations as requiring "the consent or acquiescence of a public official or other person acting in an official capacity." *Id.* § 1208.18(a)(1). The regulations further explain that "[a]cquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." *Id.* § 1208.18(a)(7). "We review a denial of relief under CAT for substantial evidence." *Mulvani v. Holder*, 771 F.3d 190, 200 (4th Cir. 2014) (citing *Lizama v. Holder*, 629 F.3d 440, 449 (4th Cir. 2011)).

The IJ held that "there is no showing that the government of Honduras would cause [Gomez] any harm nor is there any showing that the government of Honduras could not or would not provide protection to [Gomez] were she to return to Honduras," and then denied relief under CAT. A.R. 55. The BIA agreed, finding that Gomez failed to demonstrate any clear error with this factual finding. A.R. 6.

Gomez here appears to argue that the IJ improperly considered her credibility in making the assessment of the facts for purposes of the CAT claim, and also argues that the record established "the government of Honduras has been unable or unwilling to protect [Gomez]'s family." *See* Pet'r's Br. at 21–23. With respect to the credibility argument, this is incorrect in light of 8 C.F.R. § 1208.16(c)(2), which clearly and explicitly states that the IJ may consider the credibility of the alien's testimony in evaluating a CAT claim.

21

Regarding her substantive record argument, Gomez fails to meet her burden before this Court to demonstrate a clear error in the IJ's factual finding that there was a failure of proof on the issue of "consent or acquiescence of a public official" with respect to feared persecution were she to return to Honduras. She argues that the failure of the police in Honduras to arrest a suspect for either her father's or her brother's murder is conclusive evidence that she will not be protected. However, the record does not support her argument.

The Department of State's Honduras 2012 Human Rights Report (the "Report"), does indicate that "[a]mong the most serious human rights problems were . . . corruption and institutional weakness of the justice system." A.R. 246. But, the Report also indicates that Honduras has instituted an organization for police oversight, the Directorate General for the Investigation and Evaluation of the Police Career (DIECP), that has been reviewing citizen complaints "with charges including violations of human rights, corruption, acting against the public good, and participating in organized crime." A.R. 251. Thus far, 60% of the DIECP's investigations have resulted in formal criminal charges or administrative sanctions. *Id.* Additionally, to deal with official corruption, the government developed and implemented a four-year anticorruption and transparency plan based on corruption audits conducted by third parties. A.R. 257–58. The government has also created the Public Ministry's Corruption Prosecutor's Office, but over the ten-year period before the Report, the office had a 5,000-case backlog. *Id.* Additionally, Gomez's argument that the government and police are clearly corrupt because no charges

22

have been filed in her father's and brother's murder is belied by her own inability to identify a specific person in MS-13 as the killer.

In light of stronger evidence in *Lizama*, we held that the alien had "failed to demonstrate that gangs or other criminal entities . . . have the approval or acquiescence of the government." 629 F.3d at 449. Further, as we explained in *Mulvani*, "our task at this juncture 'is not to reweigh the evidence and determine which of the competing views is more compelling. It is instead to ensure that substantial evidence supports the BIA's judgment.'" 771 F.3d at 200 (quoting *Gonahasa v. INS*, 181 F.3d 538, 542 (4th Cir. 1999)). Finding such substantial evidence here, we deny Gomez's petition with respect to the CAT claim.

## V.

For the foregoing reasons, we grant in part Gomez's petition for review with respect to her eligibility for asylum and withholding of removal, deny in part with respect to her claim under CAT, and remand the case to the BIA for further proceedings consistent with this opinion.

PETITION FOR REVIEW GRANTED IN
PART AND DENIED IN PART;
REMANDED FOR FURTHER
PROCEEDINGS

23

SHEDD, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's conclusion that Gomez-Villatoro makes no meritorious claim based on fear of religious persecution, but I dissent from the majority's holding regarding asylum based on membership in a particular social group. In my view, Gomez-Villatoro has waived her social group asylum claim in relation to the gang's effort to extort money from her father and brother by failing to raise the claim in her opening brief.

Although the majority excuses the waiver under the miscarriage of justice standard, I disagree because I do not think this case is the "rare circumstance" where a miscarriage of justice would result. *A Helping Hand, LLC, v. Balt. Cty.*, 515 F.3d 356, 369 (4th Cir. 2008); *see also Suarez-Valenzuela v. Holder*, 714 F.3d 241, 249 (4th Cir. 2013). Gomez-Villatoro did not explain why she failed to raise this argument earlier or why a miscarriage of justice would result if we did not address it. Further, any error below was not "plain"; Gomez-Villatoro's own testimony before the IJ indicates that she did not face a well-founded fear of future persecution. After the death of her father, Gomez-Villatoro was in Honduras and was not killed despite MS-13's threats. A.R. 97–98. Moreover, when the IJ asked Gomez-Villatoro if she would be killed if she returned to Honduras and did not pay the war tax, Gomez-Villatoro answered "No." A.R. 98. If this does not legally foreclose her claim, it certainly means there has been no miscarriage of justice in this case. These cases often suggest difficult circumstances for those seeking protection under our law, but here the immigration process worked fairly.

24