**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-1930

EDIER DE JESUS RODRIGUEZ BEDOYA; LUZ ALEXANDRA BUILES
MAYA; D.R.B.; SARA RODRIGUEZ BUILES,

    Petitioners,

  v.

WILLIAM P. BARR, Attorney General,

    Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: October 27, 2020         Decided: November 25, 2020

Before KING, KEENAN, and HARRIS, Circuit Judges.

Petition for review granted and remand awarded by published opinion. Judge King wrote the opinion, in which Judge Keenan and Judge Harris joined.

**ARGUED:** Bradley Bruce Banias, WASDEN BANIAS LLC, Mount Pleasant, South Carolina, for Petitioners. Aliza B. Alyeshmerni, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Joseph H. Hunt, Assistant Attorney General, Carl McIntyre, Assistant Director, Nancy E. Friedman, Senior Litigation Counsel, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

KING, Circuit Judge:

Petitioners Edier de Jesus Rodriguez Bedoya and his family — that is, his wife and two children — seek review of a final order of removal entered by the Board of Immigration Appeals (the "BIA") in August 2019.[1] The BIA therein upheld the ruling of an immigration judge ("IJ") that the petitioners, who are citizens of Colombia, had not sufficiently established persecution based on threats of death and harm by the Revolutionary Armed Forces of Colombia, commonly known as FARC. As explained herein, we grant the petition for review and remand.

I.

A.

As reflected in the Administrative Record ("A.R.") filed in these proceedings, petitioner Bedoya joined the National Police of Colombia in 1992. As a Colombian police officer, Bedoya engaged with FARC and, in 1995, investigated FARC rebels located in and about Liborina, in the Department of Antioquia, Colombia. The Colombian Army thereafter used information Bedoya had gathered concerning FARC and eliminated at least three FARC guerillas. A few months later, in October 1995, Bedoya was transferred to Sabanalarga, Antioquia, a town located about an hour away from Liborina.

---

[1] Bedoya's wife and children are derivative asylum applicants in the operative application for relief. *See* 8 C.F.R. § 1208.21(a) (providing that a spouse or child "also may be granted asylum if accompanying, or following to join, the principal alien").

In approximately May 1996, after being transferred to the new town, several individuals known to Officer Bedoya messaged him to advise that FARC had threatened Bedoya's life. According to one of Bedoya's friends — a man named Ernesto Correa — fifteen or twenty FARC guerillas had seen Bedoya riding a motorcycle, recognized Bedoya as a Colombian police officer, and intended to kill him. Correa, however, told the commander of the FARC guerilla group that the biker (referring to Bedoya) was not a police officer, but was a student. The FARC commander warned Correa that if he was lying, Correa would suffer the consequences. Correa thereafter sent Bedoya several additional messages — and advised Bedoya in person — that he should be careful because the FARC guerillas would kill him and "were breathing down [his] neck." *See* A.R. 414. As a result, Bedoya was scared for his and his family's lives. He then applied to the Colombian Police for a transfer to a town called Anza, about forty miles from Liborina. Fifteen days after Bedoya transferred, FARC carried out the death threat against Correa and killed him.

Officer Bedoya continued the fight against FARC until he retired from the National Police of Colombia in 2012, having completed twenty years of public service. Soon thereafter, in 2013, Bedoya received several threatening written messages. First, in January 2013, a stranger slid a written threat under the door of Bedoya's home. The threat was addressed to Bedoya personally, bore the FARC logo, and — as translated — said to him:

> NOW THAT YOU'RE OUT OF THE POLICE WE WILL TAKE CARE
> OF THE PENDING ISSUES. WE ARE RETURNING TO THE AREA.
> THE MATTER ON 1995 IS STILL PENDING.

*See* A.R. 415. In March 2013, Bedoya received another written threat under the door of his residence, with the same FARC logo, which stated:

> YOU DO NOT SEEM TO BELIEVE. NOW WE ARE GOING TO BREATHE IN YOU [sic] EAR. HAVE YOU HEARD THE BOMBS IN SABANA?[2] YOU BETTER KNOW THAT WE ARE CLOSE TO YOU.

*Id.* at 415.

After receiving the March 2013 threat, Officer Bedoya started coming home earlier each day, avoided leaving his house unless he took significant precautions, and was again fearful for his and his family's safety. Bedoya also contacted his town's chief of police, who agreed that the written threats were worrisome and suggested that Bedoya file a formal complaint. Bedoya took the police chief's advice and made a formal complaint to the local prosecutor. Although Bedoya offered a witness and was summoned to expand upon the complaint, the prosecutor failed to open an investigation. As a result, Bedoya concluded that the local authorities could not or would not protect him and his family.

Soon thereafter, in May 2013, Officer Bedoya began receiving threatening text messages from an unknown phone number. The first text, received on May 4, 2013, at 11:20 a.m., stated, "Doesn't matter how much you hide, we will hunt you; and if not, we will catch one of your children and let's see if you appear." *See* A.R. 416. Later that same day, at 11:26 a.m., Bedoya received a second threat by text, "INCLUDING THE

---

[2] The term "SABANA" in the March 2013 threat refers to Sabanalarga, the town where Bedoya was working in 1996 when Correa and others first advised him of FARC threats.

4

DAUGHTER YOU HAVE IN MEDELLIN." *Id.* Then, two days later, on May 6, 2013, at 12:10 a.m., Bedoya received a third threatening text from the same unknown number, "LET IT BE AT THE END OF THE MONTH." *Id.*[3]

After the second text threat, Officer Bedoya and his wife bought airline tickets and made plans to leave for the United States with their children. On May 27, 2013, the family lawfully entered the United States in Florida, being admitted as non-immigrant visitors with authorization to remain in this country for six months, until November 26, 2013.

B.

On November 15, 2013, Officer Bedoya and his family timely applied with the United States Citizenship and Immigration Services ("USCIS") for asylum, withholding of removal, and protection under the United Nations Convention Against Torture (the "CAT"). USCIS referred their application to an IJ. Bedoya claimed asylum based on the foregoing events and his status as a former Colombian police officer. According to Bedoya, FARC remained active and was systematically targeting retired Colombian police officers who had fought against FARC. Bedoya advised that he only succeeded in avoiding FARC because of his skills as an ex-police officer. Bedoya further asserted, based on the threats of death and harm that FARC had made against him and his family through written notes and text messages, that he readily satisfies the past persecution element of an asylum

---

[3] Further alarming to Officer Bedoya and his family, on May 18, 2013, the principal at the children's school in Colombia was criminally charged with being a member of a Network to Support the Fifth FARC Front. According to the police, the principal gave advice to the leadership of FARC and provided ideological training to FARC members.

claim. Bedoya contended that he also has a well-founded fear of future persecution because FARC will make good on its threats if he returns to Colombia.

By decision of February 15, 2018 (the "IJ Decision"), the IJ found that Officer Bedoya's testimony was credible and that he had sufficiently corroborated his claims. Nonetheless, the IJ ruled that Bedoya and his family are removable to Colombia. More specifically, the IJ concluded that Bedoya had not shown that he had suffered past persecution. The IJ found that the period of time between the first threat Bedoya received through his friend Correa in 1996 and the threats Bedoya received by written notes and text messages in 2013 proved only an "isolated incident," rather than a "systemic" chain of events. *See* IJ Decision 8. The IJ also decided that the threats in 2013 alone were not sufficient to qualify as persecution because, as the IJ related, "all of the threats were written" and "no member of the FARC ever approached [Bedoya] or his family in person." *Id.* In addition, the "indeterminate" threats were not accompanied "by any physical injury." *Id*. at 9. The IJ found that the threats were not made on account of Bedoya's membership in a particular group — even assuming that "former Colombian police officers" constitute a particular social group — because the fact that Bedoya was a former Colombian police officer "could have merely been coincidental with the timing of the threats." *Id.*

Having concluded that Officer Bedoya had not demonstrated past persecution, the IJ ruled that Bedoya did not qualify for a presumption of a well-founded fear of future persecution. Rather, the IJ placed the burden on Bedoya to prove such a well-founded fear. The IJ then specified that Bedoya had not established how or why his fear is objectively reasonable, that there is a pattern or practice of persecuting persons similarly situated to

6

Bedoya, or that it would be unreasonable for Bedoya to relocate within Colombia. Additionally, the IJ found that Bedoya had not established that the Colombian government would be unable or unwilling to protect him from future harm. Because Bedoya had not demonstrated the well-founded fear of future persecution required for asylum, the IJ ruled that Bedoya failed to satisfy the higher standard for withholding of removal. Finally, the IJ denied Bedoya's claim for relief under the CAT.

Officer Bedoya timely appealed the IJ Decision to the BIA, and a single-member BIA panel issued a decision affirming the IJ on August 16, 2019 (the "BIA Decision"). The BIA agreed with the IJ that Bedoya had not established past persecution. More specifically, the BIA recited that "while [Bedoya] was threatened multiple times in 2013, the threats were written and he was never directly approached by any members of the FARC." *See* BIA Decision 2. The BIA then concluded that there was no clear error in the IJ's determination that Bedoya will not likely be targeted for persecution upon his return to Colombia. Because the BIA agreed with the IJ's determination that Bedoya is not eligible for asylum on persecution grounds, the BIA did not "address whether [Bedoya] established a nexus, that he could reasonably relocate, or that the government is unable or unwilling to protect him." *Id*. The BIA further ruled that Bedoya is ineligible for withholding of removal and CAT relief. This petition for review followed.

II.

We are obliged to uphold a decision of the BIA unless it is "manifestly contrary to the law and an abuse of discretion." *See Tairou v. Whitaker*, 909 F.3d 702, 706 (4th Cir.

7

2018). If the BIA does not provide a reasoned explanation for its decision, or if it distorts or disregards important aspects of an applicant's claim, the BIA has abused its discretion. *Id.* The BIA also "abuses its discretion in making an error of law." *Id.* We review factual findings for substantial evidence, and we will not disturb factual findings unless "any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* (quoting 8 U.S.C. § 1252(b)(4)(B)). In addition, we accept the factual predicate to the claim as true in the absence of an adverse credibility determination. *See* 8 U.S.C. § 1158(b)(1)(B)(iii) ("[I]f no adverse credibility determination is explicitly made, the applicant [is entitled to] a rebuttable presumption of credibility on appeal."). Finally, we review legal rulings de novo. *See Tairou*, 909 F.3d at 706.

III.

In these proceedings, Officer Bedoya maintains that the BIA erred in two primary respects. First, Bedoya contends that the BIA erred in concluding that he had failed to demonstrate past persecution. Second, Bedoya asserts that the BIA compounded its initial error by placing the burden of proof on him to prove future persecution. As explained below, we agree with Bedoya in both respects, grant his petition for review, and remand.

A.

Under the Immigration and Nationality Act, the Attorney General is entitled to grant asylum relief to eligible applicants. *See* 8 U.S.C. § 1158(b)(1)(A). To demonstrate eligibility for asylum, an asylum applicant must demonstrate that he "(1) has suffered past persecution or has a well-founded fear of persecution; (2) on account of a protected ground;

8

and (3) by an organization that the . . . government is unable or unwilling to control." *See Zavaleta-Policiano v. Sessions*, 873 F.3d 241, 246-47 (4th Cir. 2017) (alterations and internal quotation marks omitted).

Under our precedent, as we have repeatedly explained, a threat of death qualifies as past persecution. *See, e.g.*, *Zavaleta-Policiano*, 873 F.3d at 247 (emphasizing that our Court has "expressly held that the threat of death qualifies as persecution"); *Hernandez Avalos v. Lynch*, 784 F.3d 944, 949 (4th Cir. 2015) (same); *Crespin-Valladares v. Holder*, 632 F.3d 117, 126-27 (4th Cir. 2011) (same). More specifically, we have explicitly ruled that written death threats may qualify as persecution. In *Zavaleta-Policiano*, the asylum applicant demonstrated past persecution based upon "threatening notes and phone calls" relayed to the petitioner through a child used by gang members. *See* 873 F.3d at 245. In *Crespin-Valladares*, Judge Motz carefully explained that the asylum applicant had demonstrated past persecution based upon three death threats — two written and one shouted at the applicant by a gang member. *See* 632 F.3d at 126-27. Her fine opinion further emphasized that "parallel threats directed at" the asylum applicant's family members "strengthened the objective reasonableness of [the applicant's] fear." *Id.* In addition, as Judge Motz related, the threatening gang members' "penchant for extracting vengeance" bolstered the asylum applicant's claim. *Id.*

Here, Officer Bedoya's credible and undisputed evidence establishes that he and his family were subjected to at least five threats of death and harm from January to May 2013 — two written threats and three text message threats. The written threats bore the FARC logo and targeted Bedoya because he is "OUT OF THE POLICE" and "THE MATTER

9

ON 1995 IS STILL PENDING." *See* A.R. 415. Although the written threats and texts never explicitly say that FARC will "kill" Bedoya, their meaning is plain and unambiguous. They threaten death and grave injury by referencing "BOMBS" going off nearby, saying that they will "hunt" Bedoya, and texting that "it" will be at the end of the month. *Id.* at 415-16. Importantly, FARC's messages are readily understood to threaten death as a result of FARC's prior killing of Bedoya's friend Correa for lying to protect Bedoya. Finally, two of the text threats explicitly targeted members of Bedoya's family, and one text threat showed that FARC had tracked the location of Bedoya's daughter "IN MEDELLIN." *Id.* at 416. As we have repeatedly emphasized, "threats to one's close relatives is an important factor" in determining past persecution. *See Baharon v. Holder*, 588 F.3d 228, 232 (4th Cir. 2009); *see also Crespin-Valladares*, 632 F.3d at 126. Thus, like the applicants who received death threats in *Crespin-Valladares* and *Zavaleta-Policiano*, Bedoya has shown that he suffered past persecution by FARC based on threats of death and injury to him and his family.

The BIA fatally erred in deciding that Officer Bedoya had not established past persecution because the various threats were merely "written" and because Bedoya was never physically approached by FARC members. *See Zavaleta-Policiano*, 873 F.3d at 247; *Crespin-Valladares*, 632 F.3d at 126-27. We have recognized that "the threat of death alone constitutes persecution," *see Tairou v. Whitaker*, 909 F.3d 702, 708 (4th Cir. 2018), and we have never required that a petitioner be physically harmed or personally approached

10

in order for the threats to qualify as persecution.[4]  Moreover, our precedents in *Zavaleta-Policiano* and *Crespin-Valladares* demonstrate that death threats may be written.  Indeed, written home-delivered death threats and text messages can easily be more menacing than verbal threats, in that they show that the writer and sender knows where his target lives and the relevant personal cellphone number.

The BIA also emphasized the period of time between the threats that Officer Bedoya received in 1996 and those he received in 2013.  That period, however, is not dispositive of Bedoya's asylum claim, in that he has clearly shown past persecution on the basis of the threats he received in 2013.  The earlier incident in 1996 — where Bedoya's friend Correa was killed for trying to protect Bedoya from FARC — simply bolsters Bedoya's asylum claim and highlights FARC's "penchant for extracting vengeance." *See Crespin-Valladares*, 632 F.3d at 126-27.  Moreover, if FARC is targeting former Colombian police officers for their past actions, there is inevitably going to be a time gap between the actions of such officers and when an officer retires.

In sum, Officer Bedoya received multiple threats of death and harm to himself and his family, and the BIA's determination that Bedoya had not suffered past persecution was manifestly contrary to the law and constituted an abuse of discretion. *See Tairou*, 909 F.3d

---

[4] Notably, in a recent unpublished opinion, we emphasized that "[w]e have never adopted a requirement that an [asylum] applicant suffer physical harm [in order] to show past persecution." *See Lopez-Orellana v. Whitaker*, 757 F. App'x 238, 242 (4th Cir. 2018).

at 708; *Crespin Valladares*, 632 F.3d at 126. We therefore reverse the BIA's ruling that Bedoya failed to establish that he was subject to past persecution.

B.

When an asylum applicant, such as Officer Bedoya, establishes that he has suffered past persecution, he is "presumed to have a well-founded fear of future persecution." *See Zavaleta-Policiano*, 873 F.3d at 247 (quoting *Naizgi v. Gonzales*, 455 F.3d 484, 486 (4th Cir. 2006)). The BIA failed to acknowledge and apply this principle. Because we reverse the BIA's ruling that Bedoya failed to demonstrate that he suffered past persecution, Bedoya is entitled to the presumption that he has shown a well-founded fear of future persecution. In these circumstances, we vacate the determination that Bedoya failed to demonstrate a well-founded fear of future persecution. As a result, the BIA must reconsider the asylum application and apply the proper presumption.[5]

---

[5] Along with concluding that Officer Bedoya did not qualify for asylum, the BIA determined that he could not satisfy the higher standard that is applicable to his claim for withholding of removal. *See Velasquez v. Sessions*, 866 F.3d 188, 193 n.6 (4th Cir. 2017) ("[A]n applicant who is ineligible for asylum is necessarily ineligible for withholding of removal."). If the BIA concludes on remand that Bedoya is eligible for asylum, it should also reconsider his withholding of removal claim. By not addressing CAT relief in his opening brief, however, Bedoya has waived our review of the BIA's denial of protection under the CAT. *See Suarez-Valenzuela v. Holder*, 714 F.3d 241, 248-49 (4th Cir. 2013).

12

IV.

Pursuant to the foregoing, we grant the petition for review and remand for such other and further proceedings as may be appropriate.

*PETITION FOR REVIEW GRANTED AND*
*REMAND AWARDED*