**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-2115**

ANITA ELIZABETH ARGUETA DIAZ DE GOMEZ,

Petitioner,

v.

ROBERT M. WILKINSON, Acting Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: October 29, 2020                           Decided: February 8, 2021

Before MOTZ, KEENAN, and FLOYD, Circuit Judges.

Petition for review granted by published opinion. Judge Keenan wrote the opinion, in which Judge Motz and Judge Floyd joined.

**ARGUED:** Pamela P. Keenan, KIRSCHBAUM, NANNEY, KEENAN & GRIFFIN, P.A., Raleigh, North Carolina, for Petitioner. John Frederick Stanton, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Joseph H. Hunt, Assistant Attorney General, Jessica E. Burns, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

BARBARA MILANO KEENAN, Circuit Judge:

Anita Elizabeth Argueta Diaz de Gomez petitions for review of the decision of the Board of Immigration Appeals (Board) dismissing her appeal of the denial of her requests for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). Diaz de Gomez claims that she received repeated death threats from a gang in Guatemala after she and her family witnessed a mass killing by gang members and refused to acquiesce to the gang's extortion and other demands.

The immigration judge (IJ) found that Diaz de Gomez was credible and had corroborated her claims. The IJ and Board nevertheless concluded that Diaz de Gomez had not established that any persecution she suffered was on account of her familial ties or another protected ground. The Board also held that Diaz de Gomez had not shown that the Guatemalan government was unable or unwilling to protect her from this harm. After rejecting Diaz de Gomez's additional arguments, the Board dismissed Diaz de Gomez's appeal.

Upon our review, we reject the Board's "excessively narrow" view of the nexus requirement, and conclude that Diaz de Gomez established that her familial ties were one central reason for her persecution. *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 949 (4th Cir. 2015). We also hold that the record conclusively establishes that the Guatemalan government was unable or unwilling to control Diaz de Gomez's persecutors. We therefore grant the petition for review and remand for the Board to reconsider Diaz de Gomez's claims in light of our holdings.

2

I.

Diaz de Gomez, a native and citizen of Guatemala, has a university degree and worked as a primary schoolteacher in Guatemala for about eight years before fleeing the country.[1] She entered the United States in 2015 and, shortly thereafter, filed an application for asylum as well as requests for withholding of removal and protection under the CAT.

Diaz de Gomez's claims for relief are based on a series of death threats made by gang members against her beginning in 2008. In November of that year, Diaz de Gomez, her husband, and other family members witnessed a mass killing conducted by the Zetas, a Mexican gang operating in Guatemala. When the family stopped at the side of a road after hearing gunshots, gang members threatened to kill Diaz de Gomez and her husband if they reported what they had seen. A few weeks later, members of the Zetas began demanding that Diaz de Gomez's husband work for the gang, threatening to kill him or Diaz de Gomez if he refused. After the threats escalated, Diaz de Gomez's husband fled to the United States in 2010. Diaz de Gomez remained in Guatemala to continue her work as a teacher.

Around the same time, the gang sought to recruit Diaz de Gomez's brother to work for the gang, and threatened to harm him or his family if he did not acquiesce. He refused and, in April 2015, the Zetas caused a vehicle to collide with a moped on which Diaz de Gomez and her brother were riding. Following the collision, the gang kidnapped her

---

[1] Because the IJ found Diaz de Gomez to be credible, we recount the facts to which she testified at her asylum hearing. *See Bedoya v. Barr*, 981 F.3d 240, 245 (4th Cir. 2020).

3

brother, severely beat him, and cut off a piece of his tongue. In July 2015, the gang murdered him for refusing its efforts at recruitment.

After the moped incident with her brother, Diaz de Gomez began to receive death threats from the Zetas. Gang members followed her to her school, issuing threats in person, by telephone, by text message, and in writing. Diaz de Gomez testified that, in the gang's view, her position as a teacher would have made it easier for her to traffic drugs, but that she never agreed to the gang's attempts to recruit her. Around the same time, the gang attempted to extort Diaz de Gomez's parents, threatening to kill one of their children if they did not meet the gang's demands for money.

Before her brother's death, Diaz de Gomez reported the threats she received to two different law enforcement authorities. Despite two additional visits with these authorities, the government took no action against the members of the Zetas that had been threatening Diaz de Gomez and her family. Diaz de Gomez testified that she had been afraid to report the threats earlier, because people who seek police help with gangs tend to "show up dead."

While visiting her brother's grave in late 2015, Diaz de Gomez was confronted by gang members, who told her that she would be killed, like her brother was killed, if she did not agree to traffic drugs for the gang. Diaz de Gomez ultimately decided to flee to the United States in November 2015.

The Department of Homeland Security charged Diaz de Gomez with removability under 8 U.S.C. § 1182(a)(7)(A)(i)(I), for lacking valid entry documents. Diaz de Gomez conceded removability, but sought asylum, withholding of removal, and protection under the CAT. The IJ concluded that Diaz de Gomez had testified credibly and had provided

4

evidence to corroborate her claims, including evidence of country conditions in Guatemala. The IJ nevertheless rejected Diaz de Gomez's asylum claim, concluding that the harm she suffered was not on account of any statutorily protected ground and that the government was able and willing to protect her. The IJ also denied Diaz de Gomez's other claims for relief. The Board agreed with the IJ and dismissed the appeal. Diaz de Gomez now petitions for review by this Court.

## II.

Diaz de Gomez asserts that the Board erred in concluding that she was not persecuted based on her membership in the particular social group consisting of her nuclear family. Although the Zetas generally sought to recruit and extort her and her family members, Diaz de Gomez contends that her relationship to her brother, husband, and parents was at least one central reason for the persecution she suffered. She points to the sequence of events preceding her decision to leave Guatemala, and the fact that the Zetas explicitly threatened to harm her if her family members did not acquiesce to the gang's demands. Diaz de Gomez further argues that the government was unable and unwilling to protect her from the gang, based on the failure of law enforcement to respond to her complaints and the influence of the Zetas in the Guatemalan government.

The government responds that the gang targeted Diaz de Gomez and her family for financial reasons, namely, in order to extort them or recruit them into the gang, rather than due to their familial relationships. In the government's view, had Diaz de Gomez succumbed to the gang's demand to engage in drug trafficking, the death threats would

5

have stopped, irrespective of her ties to her family. Thus, the government maintains that Diaz de Gomez was not persecuted "on account of" her familial ties. The government also argues that Diaz de Gomez did not carry her burden to show that the Guatemalan government was unable or unwilling to protect her from the Zetas. We disagree with the government's arguments.

We will not overturn the agency's denial of asylum if that decision is supported by substantial evidence. *Tairou v. Whitaker*, 909 F.3d 702, 706 (4th Cir. 2018). The agency's findings of fact are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Moreover, "we accept the factual predicate to the claim as true in the absence of an adverse credibility determination." *Bedoya v. Barr*, 981 F.3d 240, 245 (4th Cir. 2020).

We review legal questions de novo. *Djadjou v. Holder*, 662 F.3d 265, 273 (4th Cir. 2011). When, as here, the Board issues a decision without adopting the reasoning of the IJ, we limit our review to the Board's final order. *Hernandez-Avalos*, 784 F.3d at 948.

To establish eligibility for asylum, an applicant must show (1) "a well-founded fear of persecution," (2) that arises "on account of a protected ground," and (3) that the persecution is "by an organization that the [] government is unable or unwilling to control." *Id*. at 948-49; 8 U.S.C. § 1101(a)(42)(A). Protected grounds include "race, religion, nationality, membership in a particular social group, [and] political opinion." 8 U.S.C. § 1101(a)(42)(A). An applicant who demonstrates past persecution on account of a protected ground is entitled to a presumption of a well-founded fear of future persecution. 8 C.F.R. § 1208.13(b)(1); *see also Hernandez-Avalos*, 784 F.3d at 949.

6

As an initial matter, we conclude that the record establishes that Diaz de Gomez was subject to past persecution in Guatemala. The IJ found that Diaz de Gomez was credible in her recitation of the threats she received, and we repeatedly have held that death threats qualify as past persecution.[2] *See Bedoya*, 981 F.3d at 246 (citing *Zavaleta-Policiano v. Sessions*, 873 F.3d 241, 247 (4th Cir. 2017); *Hernandez-Avalos*, 784 F.3d at 949; *Crespin-Valladares v. Holder*, 632 F.3d 117, 126-27 (4th Cir. 2011)). We will address the remaining elements of Diaz de Gomez's asylum claim in turn.

A.

With respect to the second requirement for asylum, we have held that a person's nuclear family qualifies as a protected particular social group.[3] *Velasquez v. Sessions*, 866 F.3d 188, 194 (4th Cir. 2017). At issue in this case is whether Diaz de Gomez has established that the past persecution she suffered was "on account of" these familial ties. 8 U.S.C. § 1101(a)(42)(A). To establish this nexus, Diaz de Gomez was required to show

---

[2] We reject the government's insinuation in a footnote that the death threats against Diaz de Gomez did not amount to persecution because some of them were made to family members rather than to her directly. The threats Diaz de Gomez received were not "unspecific" or "distant verbal threats and intimidation." *Cortez-Mendez v. Whitaker*, 912 F.3d 205, 209 n.* (4th Cir. 2019). Instead, the gang told Diaz de Gomez's husband and parents that Diaz de Gomez would be killed if her family members did not agree to the gang's demands. And, in any event, the gang threatened Diaz de Gomez directly numerous times in 2015, before she fled to the United States.

[3] In *In re L-E-A*, 27 I. & N. Dec. 581, 582 (A.G. 2019), the Attorney General held that a person's family constitutes a particular social group only if "it has been shown to be socially distinct in the eyes of its society, not just those of its alleged persecutor." However, the Board did not rely on *L-E-A* in the present case, and the government does not raise it on appeal. We therefore continue to apply our longstanding precedent holding that a person may seek asylum on the basis of their familial ties.

that her familial ties were "at least one central reason for the feared persecution." *Crespin-Valladares*, 632 F.3d at 127 (citation and internal quotation marks omitted). And, importantly, she was not required to prove that her family ties were "*the* central reason or even a dominant central reason" for the persecution, but only needed to show that her family membership was "more than an incidental, tangential, superficial, or subordinate reason." *Id.* (citation and internal quotation marks omitted). Thus, in conducting our review, we ask whether the evidence showed that Diaz de Gomez's family affiliation was one central reason "why she, and not another person, was threatened." *Hernandez-Avalos*, 784 F.3d at 950.

The record before us conclusively establishes a nexus between the death threats made against Diaz de Gomez and her ties to her nuclear family. Three facts are particularly probative of this nexus. Most notably, the threats to Diaz de Gomez's family members first began when multiple members of that family, including Diaz de Gomez, witnessed a gang killing in 2008. Shortly thereafter, Diaz de Gomez's husband started receiving threats, including threats to kill Diaz de Gomez and other family members if he did not agree to work for the gang. Second, after Diaz de Gomez's husband fled to the United States, her brother started receiving death threats to coerce him to join the gang. And third, Diaz de Gomez began to receive threats personally in 2015, after two key events: (1) the April 2015 moped collision initiated by the Zetas when gang members saw Diaz de Gomez with her brother, who had refused to join the gang and was murdered a few months later; and (2) Diaz de Gomez's parents' refusal to acquiesce to the gang's attempts at extortion. In both instances, the gang threatened to kill the brother and parents' family members if

8

they did not agree to the gang's demands. The timing and context of these threats lead to the unmistakable conclusion that Diaz de Gomez was targeted, at least for one central reason, based on her relationship to her family. *Zavaleta-Policiano*, 873 F.3d at 249 (looking to "key evidence of the context, nature, frequency, and timing of the gang's threats" against the applicant and her family).

In light of this evidence, the record conclusively shows that more than one central reason motivated the gang's death threats against Diaz de Gomez, namely, her and her family's refusal to acquiesce to the gang's several demands, and Diaz de Gomez's familial ties to her brother, husband, and parents. As we previously have emphasized, the fact that the gang sought to recruit Diaz de Gomez and her family members does not preclude a finding that her familial ties were *another* central reason that she was persecuted by the gang, establishing the required nexus. *See Cordova v. Holder*, 759 F.3d 332, 339-40 (4th Cir. 2014); *Hernandez-Avalos*, 784 F.3d at 950 (explaining that there can be "multiple central reasons" underlying a person's persecution). And although Diaz de Gomez's position as a teacher may have made her an attractive target for gang recruitment, she only began receiving threats personally after the gang associated her with her brother following the moped incident.[4] *See Cruz v. Sessions*, 853 F.3d 122, 129 (4th Cir. 2017) (explaining

---

[4] Our conclusion is not altered by Diaz de Gomez's statement agreeing with the government that the threats were unrelated to her "last name." She immediately proceeded to clarify her response during her testimony. And, in any event, we decline to "cherry pick" this isolated statement out of context. For the reasons discussed above, the record conclusively demonstrates that the Zetas's recruitment efforts were intertwined with the gang's repeated threats to retaliate against Diaz de Gomez based on her family members' refusal to acquiesce to the gang's demands.

9

that a family relationship can be one central reason for persecution even if it is "intertwined" with the persecutor's other motivations).

Given the express threats that the gang would hurt Diaz de Gomez if her family members did not accede to the gang's demands, we are left with no doubt that Diaz de Gomez's family relationship was "more than an incidental, tangential, superficial, or subordinate reason" for her persecution. *Hernandez-Avalos*, 784 F.3d at 949 (internal quotation marks omitted). As in many recent cases, the Board's contrary conclusion is an "excessively narrow reading" of the nexus requirement that is not supported by our precedent. *Id.*; *see also, e.g.*, *Cruz*, 853 F.3d at 128 ("[W]e have been compelled to disagree with several of the BIA's recent decisions holding that an applicant failed to meet the statutory nexus requirement for obtaining relief from removal."); *Salgado-Sosa v. Sessions*, 882 F.3d 451, 458 (4th Cir. 2018) (holding that the IJ and the Board "erred by focusing narrowly on the 'immediate trigger'" for the threats without considering the "relationships that prompted the asserted persecution"); *Oliva v. Lynch*, 807 F.3d 53, 60 (4th Cir. 2015) (noting that the Board drew "too fine" a distinction regarding the nexus requirement). For these reasons, we conclude that the record indisputably shows that Diaz de Gomez has satisfied her burden to show that she was persecuted on account of a statutorily protected ground, namely, the particular social group of her nuclear family.[5]

B.

---

[5] Because we conclude that her familial ties were one central reason for her persecution, we do not address the other particular social groups that Diaz de Gomez has asserted.

10

We turn to consider Diaz de Gomez's argument that the Board erred in concluding that the Guatemalan government was willing and able to protect her from persecution. She notes that two law enforcement agencies failed to respond to her complaints despite her multiple requests for help. She also points to record documentation showing the Zetas's influence over local government and law enforcement officials in Guatemala, which corruption prevented the authorities from taking action against members of the gang.

Relying primarily on out-of-circuit cases, the government asserts that a "slow and cumbersome" law enforcement process does not justify a grant of asylum. The government instead argues that the Guatemalan government was taking active steps to combat gang activity in the country. With respect to Diaz de Gomez specifically, the government faults her for leaving for the United States soon after filing her police report. We disagree with the government's arguments.

"When an applicant claims that she fears persecution by a private actor, she must also show that the government in her native country 'is unable or unwilling to control' her persecutor." *Orellana v. Barr*, 925 F.3d 145, 151 (4th Cir. 2019) (quoting *Hernandez-Avalos*, 784 F.3d at 949). Evidence of "widespread gang influence and corruption" in the judicial system, together with an applicant's credible testimony, can be sufficient to establish the government's inability or unwillingness to offer protection. *Hernandez-Avalos*, 784 F.3d at 952-53. The issue whether the government was unable or unwilling to control the actions of a persecutor "is a factual question that must be resolved based on the record in each case." *Crespin-Valladares*, 632 F.3d at 128 (citation omitted).

11

Diaz de Gomez provided credible testimony that she reported the escalating threats against her to the police in 2015, following the moped accident. She stated that she had been afraid to report the threats earlier, because people tend to "just show up dead" after filing police reports. To support her allegations, she showed law enforcement officers the written messages she had received, and also provided audio recordings of the telephone threats. She reported the threats to both the public affairs ministry and to the local police. Neither law enforcement agency took any action in response to the reports; no one was arrested, and officials never provided Diaz de Gomez any updates on the investigation. She returned to the police station twice to check on the status of the investigation, and was told both times that the person in charge of her case was unavailable. A friend who followed up after Diaz de Gomez left for the United States received the same response.

This lack of action by law enforcement authorities is consistent with evidence of country conditions that Diaz de Gomez submitted to corroborate her claims. The 2015 Department of State Country Report on Human Rights Practices noted Guatemala's "widespread institutional corruption, particularly in the police and judicial sectors," including the involvement of police and military officers in drug trafficking and extortion. Referencing the Zetas specifically, one 2010 academic study explained that the gang has a "propensity to attack state institutions," including by bribing police and judicial officials and "infiltrat[ing] [the gang's] supporters into the civil service." Approximately $1 billion of drug proceeds is used to bribe Guatemalan government officials annually, and "corruption is rampant at the local level." Notably, "organized crime has infested so many

[Guatemalan] state institutions as to render them virtually worthless," and the government has "fail[ed] to provide even a minimal level of domestic security."[6]

This evidence of "widespread gang influence and corruption," together with Diaz de Gomez's credible testimony regarding her fear of reporting the Zetas and the failure of law enforcement to investigate her claim, leads to the inescapable conclusion that the government was unwilling or unable to protect her from her persecutors. *See Hernandez-Avalos*, 784 F.3d at 952-53. And, relevant here, the government's "empty or token 'assistance' cannot serve as the basis of a finding" that the Guatemalan government was willing and able to protect Diaz de Gomez. *Orellana*, 925 F.3d at 153. It is undisputed that no action was taken on Diaz de Gomez's complaints to law enforcement but, instead, the death threats escalated. In light of her multiple failed attempts to secure protection from law enforcement authorities in Guatemala, coupled with the persuasive evidence of the Zetas's corruptive influence on the Guatemalan government, the record conclusively shows that the government was unwilling or unable to control her persecutors.

---

[6] The record contains evidence that some members of the Zetas were arrested in Guatemala between 2010 and 2015. The news articles reporting these arrests also emphasize the significant influence of the Zetas in Guatemala, including the fact that law enforcement agencies had been infiltrated by members of the gang. Irrespective of these arrests, however, the other evidence in the record establishes that the government was unable or unwilling to protect Diaz de Gomez from her persecutors. *See Hernandez-Avalos*, 784 F.3d at 952 n.8 ("To the extent the IJ suggested that the gang member's imprisonment for unrelated killings in any way supports the inference that the Salvadoran authorities would have been responsive to Hernandez's complaints, that conclusion is unwarranted.").

III.

In sum, we conclude that the Board erred in holding that Diaz de Gomez failed to establish that she suffered past persecution on account of her ties to her nuclear family and that the government was able and willing to protect her. We remand the case for further consideration so that Diaz de Gomez may receive the benefit of the presumption that she has a well-founded fear of future persecution if she returns to Guatemala. *See Naizgi v. Gonzales*, 455 F.3d 484, 486 (4th Cir. 2006); 8 C.F.R. § 1208.13(b)(1). We therefore do not reach the Board's further rulings, including (1) Diaz de Gomez's ability to relocate safely within Guatemala, and (2) her additional claims for asylum on humanitarian grounds, for withholding of removal, and for protection under the CAT. We remand all these issues to the Board for reconsideration in light of our holding.

*PETITION FOR REVIEW GRANTED*