**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-1821**

VICENTE DE JESUS ALEMAN-MEDRANO; T.E.A.S.,

Petitioners,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: September 24, 2021                          Decided: November 1, 2021

Before WILKINSON, WYNN, and HARRIS, Circuit Judges.

Petition for review granted by unpublished opinion. Judge Harris wrote the opinion, in which Judge Wilkinson and Judge Wynn joined.

**ARGUED:** Abdoul Aziz Konare, KONARE LAW, Frederick, Maryland, for Petitioners. Margaret Anne O'Donnell, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Jeffrey Bossert Clark, Acting Assistant Attorney General, Nancy Friedman, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

Unpublished opinions are not binding precedent in this circuit.

PAMELA HARRIS, Circuit Judge:

Vicente de Jesus Aleman-Medrano and his daughter T.E.A.S., citizens and natives of El Salvador, entered the United States after an MS-13 gang member raped T.E.A.S. and Aleman-Medrano filed a police report about the incident. According to Aleman-Medrano, MS-13 members threatened to kill him after he filed the report, and he now fears persecution based on his family ties if returned to El Salvador. An Immigration Judge denied Aleman-Medrano's applications for asylum and withholding of removal on the ground that he had failed to establish the requisite "nexus" between the gang's threats and his relationship to his daughter, and the Board of Immigration Appeals affirmed. We disagree, and for the reasons that follow, we grant the petition for review and remand for further proceedings.

## I.

In June 2016, Aleman-Medrano and T.E.A.S. entered the United States without authorization and were soon apprehended by the Department of Homeland Security. In 2017, they conceded removability under the Immigration and Nationality Act, and each filed applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").

We begin by summarizing Aleman-Medrano's account of the events that led to his flight from El Salvador, taken from testimony deemed credible by the Immigration Judge ("IJ") and other evidence submitted in support of his application. We then turn to the legal proceedings that followed.

2

## A.

Early one morning in October 2015, Aleman-Medrano received a call from the police. They told him that during a raid on the home of Noe Alexander Vasquez Sigaran, an MS-13 gang member, they had discovered Sigaran having sex with Aleman-Medrano's daughter, T.E.A.S. At the time, although the two had recently begun to live together, Sigaran was 18 years old and T.E.A.S. was only 12. The police had arrested both Sigaran and T.E.A.S., and they asked Aleman-Medrano to come to the station to pick up his daughter.

When Aleman-Medrano arrived, however, the police would not release T.E.A.S. unless he first agreed to press charges against Sigaran. Feeling himself "forced" to comply, Aleman-Medrano acceded to their demand and filed a police report against Sigaran. A.R. 178. As a result, the police detained Sigaran on the charge of rape of a minor and, as promised, released T.E.A.S. from custody.

The next day, when Aleman-Medrano left home for work, he observed several armed men loitering around his front door. When he returned home that evening, they were still there. That night, the local MS-13 leader approached Aleman-Medrano and demanded that he go to the police, tell them that Sigaran was not a gang member, and withdraw his report against Sigaran. If he failed to do so, the gang leader warned, "there would be dire consequences." A.R. 178; *see* A.R. 158, 169 (claiming that the gang leader threatened to kill him and T.E.A.S.). For five days, the armed men continued to menace Aleman-Medrano's home, flashing their guns at him as he came and went.

3

Later that week, Aleman-Medrano went to the police and asked to withdraw his report against Sigaran. The police refused. Instead, they told him, if he wanted "to avoid having [his] life in danger," he should decline to appear in court. A.R. 107. Aleman-Medrano heeded this advice, refusing to testify against Sigaran. As a result, the case against Sigaran stalled and, about six months after his arrest, a court "provisionally dismiss[ed]" the charge against him and released him on conditions. A.R. 188–91.

Soon after Sigaran's release from jail, he appeared at Aleman-Medrano's house. According to Aleman-Medrano's written testimony, Sigaran arrived while he was out at work and only T.E.A.S. was home, asked T.E.A.S. to come to live with him, and, when she refused, told her that "he would kill [Aleman-Medrano] if she did not return with him."[1] A.R. 179. As a result, T.E.A.S. asked Aleman-Medrano later that evening if they could "leave to a safer place," and Aleman-Medrano decided to flee with his family. *Id.* He testified that he did not tell the police about this threat because he feared that he would have been killed if he did.

The next week, Aleman-Medrano, his partner, and their four children left their home for a different town about two hours away. Months later – still fearing for their safety and unsure that the police would be able to protect them given that several of those who had

---

[1] In his oral testimony, Aleman-Medrano first described this incident differently, stating that Sigaran had expressed his desire to live with T.E.A.S. directly to Aleman-Medrano after he returned home from work, and omitting any threat on his life. When confronted with this discrepancy on cross-examination, Aleman-Medrano clarified that Sigaran had *first* arrived while he was out at work – when Sigaran conveyed his threat to T.E.A.S. – but that Aleman-Medrano *then* returned home to find Sigaran there, when he and Sigaran spoke directly.

investigated Sigaran had since been killed – Aleman-Medrano and T.E.A.S. again fled, this time for the United States.

**B.**

The IJ found that Aleman-Medrano had testified credibly but denied his application for relief. The IJ rejected Aleman-Medrano's claims for asylum and withholding of removal because he had not shown that any persecution he suffered, or reasonably feared suffering, was "on account of" – that is, had a "nexus" to – a statutorily protected ground. *See* 8 U.S.C. § 1101(a)(42)(A) (identifying "race, religion, nationality, membership in a particular social group, or political opinion" as protected grounds supporting asylum); *id.* § 1231(b)(3)(A) (same for withholding of removal).[2] The IJ recognized that threats based on family ties could qualify as persecution based on membership in a "particular social group," A.R. 54, and that such membership need only be "at least one of multiple central reasons for the persecution" to support relief, *id.* But he found that none of the persecution Aleman-Medrano had faced was, as Aleman-Medrano claimed, based on his family ties to T.E.A.S.[3] Instead, the IJ held, any such persecution was "motivated by vengeance and retribution" for Aleman-Medrano's filing of charges against Sigaran for raping his

---

[2] An applicant must show persecution based on a statutorily protected ground to qualify for either asylum or withholding of removal. But the standard of proof is higher for a withholding claim, requiring the applicant to establish a "clear probability" of persecution, rather than the "well-founded fear" of persecution sufficient to make out an asylum claim. *See Marynenka v. Holder*, 592 F.3d 594, 600 (4th Cir. 2010).

[3] Aleman-Medrano also argued before the IJ that he was persecuted based on his membership in the particular social group of "non-criminal informants." A.R. 56–57. The IJ rejected that claim, and Aleman-Medrano did not appeal that denial.

5

daughter, and "the same threats could have been directed at anyone" who had done so. A.R. 57.

The IJ then turned to T.E.A.S.'s separate application for relief. He denied T.E.A.S.'s claims for asylum and withholding because she had not shown that she faced persecution "on account of" a protected ground. The IJ also identified a second and independent ground for denying T.E.A.S.'s claims: "When an applicant claims that she fears persecution by a private actor," – here, Sigaran – "she must also show that the government in her native country is unable or unwilling to control her persecutor." *Diaz de Gomez v. Wilkinson*, 987 F.3d 359, 365 (4th Cir. 2021) (internal quotation marks omitted). Here, the IJ held, T.E.A.S. could not satisfy the "unable or unwilling" requirement, given the government's detention of Sigaran and efforts to charge and convict him for raping her. A.R. 58.

Last, the IJ rejected both Aleman-Medrano's and T.E.A.S.'s claims for CAT relief because they had failed to show that the government of El Salvador would consent to or acquiesce in their torture. A.R. 58–59 (finding some "ineptness" but declining to "equate ineffectiveness with consent or acquiescence").

Aleman-Medrano appealed the IJ's denial of his application to the Board of Immigration Appeals ("BIA"), arguing that the IJ had too strictly construed the nexus requirement and improperly denied CAT relief.[4] The BIA affirmed. As to asylum and

---

[4] Aleman-Medrano did not appeal the IJ's denial of T.E.A.S.'s independent claims for relief to the BIA and has not sought review of that denial in this court. As a result, T.E.A.S. is eligible for relief only as a derivative applicant, or rider, on Aleman-Medrano's

6

withholding, it offered two alternative grounds for affirming the denial of relief. First, it "agree[d]" with the IJ that Aleman-Medrano had not established a nexus between any past or likely persecution and his family ties to T.E.A.S. A.R. 4. The IJ's finding that the "motive for the harm was 'vengeance and retribution' for the filing of a police report," the BIA concluded, was not clearly erroneous. *Id.* And second, it "further agree[d] that the respondents have not established that the authorities were unable or unwilling to protect them." *Id.* Finally, the BIA affirmed the denial of CAT relief, reasoning that "because the respondent could not meet this lower [unable-or-unwilling] standard, it follows he did not establish that government officials would consent or acquiesce in his torture." *Id.*

Aleman-Medrano and T.E.A.S. timely petitioned this court for review.

## II.

"When, as here, the BIA affirms the IJ's decision with an opinion of its own, we review both decisions." *Salgado-Sosa v. Sessions*, 882 F.3d 451, 456 (4th Cir. 2018). "We review factual findings for substantial evidence, treating them as conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Perez Vasquez v. Garland*, 4 F.4th 213, 220 (4th Cir. 2021) (internal quotation marks omitted). "[O]ur review of the BIA's and IJ's determination of . . . factual question[s] is limited to considering whether their conclusion is supported by reasonable, substantial, and probative

---

application. *See* 8 U.S.C. § 1158(b)(3)(A); 8 C.F.R. § 208.21. In such circumstances, though T.E.A.S. remains a petitioner before this court, "we need only examine [Aleman-Medrano's] arguments." *Velasquez v. Sessions*, 866 F.3d 188, 193 n.3 (4th Cir. 2017).

7

evidence." *Cruz v. Sessions*, 853 F.3d 122, 128 (4th Cir. 2017) (internal quotation marks omitted). We review the agency's legal conclusions de novo. *See Portillo Flores v. Garland*, 3 F.4th 615, 625 (4th Cir. 2021) (en banc).

To qualify for asylum, Aleman-Medrano must show that he "(1) has a well-founded fear of persecution; (2) on account of a protected ground; (3) by an organization that the Salvadoran government is unable or unwilling to control." *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 949 (4th Cir. 2015). For withholding of removal, he must make the same showing but subject to a higher standard of proof. *Marynenka v. Holder*, 592 F.3d 594, 600 (4th Cir. 2010). Aleman-Medrano's central argument on appeal is that the agency erred at the second step of the analysis, improperly rejecting his claim that he was targeted by gang members "on account of" his family ties to his daughter. We agree and, finding no independent basis on which to affirm the agency's denial of relief, remand for further proceedings.

**A.**

As all parties agree, and as the IJ expressly recognized, membership in a nuclear family qualifies as a protected ground under the Immigration and Nationality Act. *See, e.g.*, *Crespin-Valladares v. Holder*, 632 F.3d 117, 125 (4th Cir. 2011) ("[T]he family provides a prototypical example of a particular social group." (internal quotation marks omitted)). So, as to nexus, the only question in this case is whether Aleman-Medrano can establish that the harm he experienced and feared was "on account of" his family ties to T.E.A.S.

8

The standard governing that inquiry is clear and well-settled: To establish the requisite nexus, Aleman-Medrano need show only that his relationship to his daughter was "at least one central reason" for the gang's threats against him. *Diaz de Gomez*, 987 F.3d at 363. A merely "incidental, tangential, superficial or subordinate" connection to family ties will not suffice. *Id.* But "[a]s we have repeatedly emphasized," it is enough if Aleman-Medrano's tie to his daughter was "at least one central reason" – even if "intertwined with others" – why "[he], and not another person was threatened." *Perez Vasquez*, 4 F.4th at 224 (emphasis omitted) (internal quotation marks omitted) (collecting cases).

Under this familiar standard, we are compelled to conclude that Aleman-Medrano's relationship with his daughter was at least one central reason why he, and not someone else, was threatened by MS-13. It was only because Aleman-Medrano is T.E.A.S.'s father that he was summoned to the police station at all. The police then purposefully used that very family relationship – withholding 12-year-old T.E.A.S.'s release from jail as leverage against her father – to strong-arm Aleman-Medrano into filing a police report against Sigaran. *Cf. Hernandez-Avalos*, 784 F.3d at 950 (finding family nexus where gang's threats "leveraged" mother's authority over her son's actions). And that police report, as the agency acknowledges, is what precipitated the gang's threats against Aleman-Medrano. *See* A.R. 4. In short, there is simply "no evidence" in this record that Aleman-Medrano

9

"would have been selected as the recipient of those threats absent [his] familial connection" to T.E.A.S. *Hernandez-Avalos*, 784 F.3d at 950 n.7.[5]

The agency's contrary finding, and the government's argument in support of it, are foreclosed by our precedent. Both posit that the gang members who targeted Aleman-Medrano were motivated not by his ties to his daughter, but by a desire to retaliate against him for filing a criminal complaint against the man who raped his daughter. We rejected precisely that rationale, however, in *Cruz*, 853 F.3d at 125–30, in which the man who killed Cruz's husband also threatened Cruz to prevent her from investigating her husband's death or going to the police. In that case, as in this one, the government argued that the threats against Cruz were based on an effort to head off a police report, not family ties, and could have been made against "any interested party" investigating the killing. *Id.* at 127. But that reasoning, we explained, failed to appreciate the "intertwined" reasons for Cruz's persecution: The "immediate trigger" may have been preventing Cruz from going to the police, but the reason why Cruz, and not some other person, was targeted was her familial tie to her husband – "the very relationship that prompted [Cruz] to search for her husband, to confront [the killer], and to express her intent to contact the police." *Id.* at 129. So too

---

[5] The government faults Aleman-Medrano for relying on his own testimony and declaration to support these facts, characterizing them as reflecting only "his subjective fear of returning to El Salvador." But the IJ found Aleman-Medrano's testimony credible, and credible testimony "may be sufficient to sustain [an] applicant's burden." 8 U.S.C. § 1158(b)(1)(B)(ii). Further, these sources "include[] much more than [Aleman-Medrano's] subjective beliefs – [they] contain[] key evidence of the context, nature, frequency, and timing of the gang's threats against [him] and [his] family." *Zavaleta-Policiano v. Sessions*, 873 F.3d 241, 249 (4th Cir. 2017).

here: The gang may have wished to exact "vengeance and retribution" against Aleman-Medrano for filing a police report, A.R. 4, but the thing that brought Aleman-Medrano to the police station and allowed the police to pressure him into filing that report was his relationship with his daughter. That is enough, under *Cruz* and cases like it, to make his familial ties "a central reason" for the gang's threats against him. *Cruz*, 853 F.3d at 129; *see also, e.g.*, *Perez Vasquez*, 4 F.4th at 224–27 (reversing adverse nexus finding where a gang extorted the petitioner for money that she received from her husband in the United States each month); *Hernandez-Avalos*, 784 F.3d at 949–50 (same where gang threatened mother for blocking its efforts to recruit her son).

We recognize, of course, that not "every threat that references a family member is made on account of family ties." *Hernandez-Avalos*, 784 F.3d at 950 n.7; *see, e.g.*, *Cedillos-Cedillos v. Barr*, 962 F.3d 817, 824–26 (4th Cir. 2020) (finding no nexus where the petitioner was threatened after he witnessed gang members kill his brother in public). But here, as measured against our precedent, the record compels the conclusion that Aleman-Medrano's relationship with his daughter was "at least one central reason," even if "intertwined with others," why he, and not someone else, was threatened by MS-13.[6] *Perez Vasquez*, 4 F.4th at 224 (emphasis omitted) (internal quotation marks omitted). We

---

[6] Contrary to the agency's findings, "that other members of [Aleman-Medrano's] family may not have been . . . targeted by MS-13 does not undermine [his] own fear of persecution." *Cordova v. Holder*, 759 F.3d 332, 339 (4th Cir. 2014); *see also Cruz*, 853 F.3d at 129. The absence of such threats does not "undermine the reasonableness of [Aleman-Medrano's] own fear of persecution, for [his] fear is premised on threats directed at him personally." *Crespin-Valladares*, 632 F.3d at 127 n.6.

11

therefore hold that MS-13's threats to Aleman-Medrano arose "on account of" his family ties and that he thus has met the nexus requirement for both asylum and withholding of removal.

**B.**

The government argues that we still may affirm the denial of Aleman-Medrano's asylum and withholding claims on an independent basis: the agency's alternative finding that he failed to show that the government of El Salvador was unable or unwilling to protect him from MS-13. *See Diaz de Gomez*, 987 F.3d at 365 (outlining unable-or-unwilling requirement). We cannot agree, however, that the agency made such a finding. As a result, our review of that issue would be premature. Instead, as in the ordinary case, we remand the matter for the agency to consider this issue in the first instance. *See Alvarez Lagos v. Barr*, 927 F.3d 236, 252 (4th Cir. 2019).

Contrary to what appears to have been the BIA's supposition, the IJ did not make a finding as to whether Aleman-Medrano could show that the Salvadoran government was unable or unwilling to control MS-13's actions against him. The IJ did find that *T.E.A.S.* had "failed to demonstrate that the government of El Salvador was unable or unwilling to protect her from Mr. Vasquez Sigaran." A.R. 58. But the IJ's only reason for denying *Aleman-Medrano's* claims for asylum and withholding was his failure to "establish that he was subject to past persecution on account of a protected ground." A.R. 56–58. And, accordingly, at no point in his discussion of Aleman-Medrano's claim did the IJ even refer to the Salvadoran government's ability or willingness to protect him from gang violence.

12

On appeal, however, the BIA purported to affirm a finding of the IJ that Aleman-Medrano had failed to meet the unable-or-unwilling requirement, indicating only that it "agree[d]" with what "[t]he Immigration Judge found" on this point. A.R. 3–4. But the IJ, as we have just explained, did not make that finding. The upshot is that *no* agency reviewer actually has found that Aleman-Medrano failed to show the Salvadoran government was unable or unwilling to control MS-13's persecution of him. *See Crespin-Valladares*, 632 F.3d at 128 ("Whether a government is unable or unwilling to control private actors . . . is a factual question that must be resolved based on the record in each case." (internal quotation marks omitted)).

As the government conceded at oral argument, we cannot affirm on such a record. Our review is limited to "the grounds upon which the agency acted," *Cordova v. Holder*, 759 F.3d 332, 337 (4th Cir. 2014) (internal quotation marks omitted), and we may not affirm a finding the agency failed to make, *see Li Fang Lin v. Mukasey*, 517 F.3d 685, 693–94 (4th Cir. 2008) ("[W]e cannot review the BIA's decision because the BIA has given us nothing to review."). And even if we could read the BIA, contrary to its stated rationale, as having made an independent finding as to the ability and willingness of the Salvadoran government to protect Aleman-Medrano from MS-13, we still would be left unsure as to its rationale for doing so: Its explanation was rooted in agreement with the IJ's finding as to T.E.A.S. alone and offered no reason for extending that finding to Aleman-Medrano. In these circumstances, the proper course is to remand to the agency. *See Portillo Flores*, 3 F.4th at 636–37 (holding that remand is the "appropriate treatment when the grounds upon which the administrative agency acted are not clearly disclosed and adequately

13

sustained" (internal quotation marks omitted)); *Zelaya v. Holder*, 668 F.3d 159, 168 (4th Cir. 2012) (remanding where lack of "reasoned explanation" impaired "meaningful[] review" of the BIA's decision).

We take no position on whether Aleman-Medrano could show, on the record here, that the Salvadoran government was unable or unwilling to protect him from MS-13.[7] As the government emphasizes, the prosecution record in Sigaran's case shows that the Salvadoran authorities detained him, investigated him, and sought to prosecute him. And the IJ properly took account of that in finding that T.E.A.S. could not show that the Salvadoran government was unable or unwilling to protect *her* from *Sigaran*. But the question here is whether the government also is able and willing to protect *Aleman-Medrano* from *MS-13*. *See, e.g.*, A.R. 178–79 (claiming that the police "turned [Aleman-Medrano] away" when he sought help). And while the government's actions against Sigaran – an MS-13 member – may well be relevant to this distinct question as well, "the proper course . . . is to remand to the agency for additional investigation or explanation," not to conduct our own "*de novo* inquiry into the matter." *INS v. Orlando Ventura*, 537 U.S. 12, 16 (2002) (per curiam).

---

[7] Nor, of course, do we take any position on Aleman-Medrano's ultimate entitlement to relief. This appeal focuses on Aleman-Medrano's claim of past persecution. If the agency were to agree on remand that Aleman-Medrano can establish past persecution, then he would be entitled to a presumption of a well-founded fear of future persecution – but that presumption may be rebutted by the government with an appropriate showing. *See* 8 C.F.R. § 1208.13(b)(1)(i)(A)–(B). The agency has had no occasion to address these issues, and they are not before us.

14

Finally, given our holding, we also remand Aleman-Medrano's CAT claim to the agency for further consideration. The BIA's affirmance of the denial of CAT relief hinged entirely on its disposition of Aleman-Medrano's asylum and withholding claims. *See* A.R. 4 ("[B]ecause the respondent could not meet this lower [unable-or-unwilling] standard, it follows he did not establish that government officials would consent or acquiesce in his torture."). As a result, we must remand all these related issues for reconsideration in light of our holding on asylum and withholding. *See, e.g.*, *Diaz de Gomez*, 987 F.3d at 367.

## III.

For the reasons given above, the petition for review is granted and the case is remanded to the BIA for further proceedings consistent with this opinion.

*GRANTED*